Ronald S. Draper
5780 Dichondra Place
Newark, CA 94560
(510) 795-7524
rsdraper@gmail.com

**FILED**

APR 27 2018

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

Ronald S. Draper

**Plaintiff,**

vs.

_____,

KCG Americas LLC ("KCG"),
Daniel B. Coleman, CEO of KCG
Carl Gilmore, Director of KCG Futures
Greg Hostetler, KCG Compliance Officer
Main Street Trading, Inc. ("MST"),
Patrick J. Flynn, President of MST
Wedbush Securities Inc. ("Wedbush")
Edward W. Wedbush, President of Wedbush
ION Trading, Inc. ("ION")
Andrea Pignataro, CEO of ION, Global
Robert Sylverne, CEO of ION, USA
Computer Voice Systems, Inc. ("QST")
Paul Sturm, CEO of QST and
Scott William Benz, VP

**Defendants**

) **Case Number:**
)
) **COMPLAINT FOR:** ~~MEJ~~
)  **C18-02524**
) **1. FRAUDULENT CONCEALMENT**
) **2. FRAUDULENT MISREPRESENTATIONS**
) **3. BREACH OF FIDUCIARY DUTY**
) **4. BREACH OF CONTRACT UNDER**
)  **CALIFORNIA LAW**
) **5. AIDING AND ABETTING**
) **6. ELDER FINANCIAL ABUSE**
) **7. VIOLATION OF CALIFORNIA UNLAWFUL**
)  **ACTIVITY & FRAUDULENT CONDUCT LAW**
) **8. VIOLATIONS OF THE CALIFORNIA**
)  **UNFAIR COMPETITION LAW**
) **9. VIOLATIONS OF THE CALIFORNIA**
)  **CONSUMER LEGAL REMEDIES ACT**
) **10. VIOLATIONS OF THE CALIFORNIA**
)  **FALSE ADVERTISING LAW and**
) **11. EMPLOYMENT OF MANIPULATIVE**
)  **DEVICES/SCHEME TO DEFRAUD**
)
) **Federal Statutes:**
) FRCP §9(b), 7 U.S.C. §2(a)(1)(B), 7 U.S.C. §6b,
) 7 U.S.C. §7a-2, ), 7 U.S.C. §13c(a), CEA §6(c)(1),
) 7 U.S.C. § 25, 18 U.S.C. §2 and 18 U.S.C. §1962
)
) **California Statutes:**
) CCC §1572, CCC §1573, CCC §1709, CCC
) §1710, CCC §3294 and Corp. 29536
)
) **NFA Rules:**
) Rules 2-2, 2-4, 2-9, 2-26, 2-29, 2-30, 2-38

# JURY TRIAL DEMANDED

---

## PLAINTIFF DRAPER'S COMPLAINT

# TABLE OF CONTENTS

| <u>No.</u> | <u>Description</u> | <u>Pg</u> |
|---|---|---|
| I. | SUMMARY OF THE COMPLAINT.................................................. | 13 |
| II. | NATURE OF THE ACTION........................................................... | 14 |
| III. | BACKGROUND........................................................................... | 15 |
| | A. Formation of California Joint Venture For Trading Commodity Futures Spreads in 2009 ..................................................... | 15 |
| | B. The Legal and Technology Challenges Posed by Electronic Trading in Commodity Futures and the U.S. Regulatory Response Thereto...................... | 19 |
| | C. Plaintiff's Commodity Futures Trading Business Activities................................. | 19 |
| | D. Defendants' Common Enterprise........................................ | 20 |
| | E. Defendants' Business Activities........................................ | 21 |
| IV. | JURISDICTION.......................................................................... | 21 |
| V. | VENUE....................................................................................... | 22 |
| VI. | INTRADISTRICT ASSIGNMENT.............................................. | 22 |
| VII. | PARTIES................................................................................... | 22 |
| | A. Plaintiff........................................................................... | 22 |
| | B. Defendants....................................................................... | 23 |
| | C. Other Parties of Interest.................................................. | 27 |
| VIII. | FACTUAL ALLEGATIONS........................................................ | 28 |
| | A. FRAUDULENT CONCEALMENT......................................... | 28 |
| | A1. By Defendants MST, Flynn, and KCG and its officers, employees and agents, prior to opening Account #TSMPF148 ...................... | 28 |
| | A2. By Defendants MST, Flynn, and Wedbush and its officers, employees and agents, prior to transferring Account #TSMPF148 .................... | 31 |
| | B. FRAUDULENT MISREPRESENTATIONS BY DFENDANTS........................... | 33 |
| | C. BREACH OF FIDUCIARY DUTY......................................... | 57 |
| | D. CLEARING FCM-DEEENDANTS, KCG'S AND WEDBUSH'S BREACH OF CONTRACT UNDER CALIFORNIA LAW............................. | 58 |
| | E. AIDING AND ABETTING.................................................. | 60 |
| | F. FINANCIAL ELDER ABUSE............................................... | |

**X.   CAUSES OF ACTION** ..................................................................................... 64

   A.   First Cause of Action (FRAUDULENT CONCEALMENT) ............................ 64

   B.   Second Cause of Action (FRAUDULENT MISREPRESENTATIONS) ................ 71

   C.   Third Cause of Action (BREACH OF FIDUCIARY DUTY) ............................ 74

   D.   Fourth cause of Action (CLEARING FCM-DEFENDANTS, KCG'S AND WEDBUSH'S BREACH OF CONTRACT UNDER CALIFORNIA LAW ...... 75

   E.   Fifth Cause of Action (DEFENDANTS' AIDING AND ABETTING) ................. 77

   F.   Sixth Cause of Action (FINANCIAL ELDER ABUSE) ....................................

   G.   Seventh Cause of Action (VIOLATIONS OF THE CALIFORNIA UNLAWFUL ACT AND FRAUDULENT CONDUCT LAW (CAL. CORP. CODE § 29536 *ET SEQ.*)) ......................................................................... 78

   H.   Eighth Cause of Action (VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*)) ....... 79

   I.   Ninth Cause of Action (VIOLATIONS OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT (CAL. CIV. CODE § 1750 *ET SEQ.*)) ................................................................................................... 81

   J.   Tenth Cause of Action (VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW (CAL. BUS. & PROF. CODE § 17500 *ET SEQ.*)) ....... 84

   K.   Eleventh Cause of Action (EMPLOYMENT OF MANIPULATIVE DEVICES AND SCHEME BY DEFENDANTS TO DEFRAUD PLAINTIFF) ................................................................................................. 85

**XI.   CONCLUSION** ................................................................................................ 87

**XII.   DEMAND FOR RELIEF** .................................................................................. 88

**XIII.   DEMAND FOR JURY TRIAL** ....................................................................... 88

**XIV.   EXHIBITS** ..................................................................................................... *

   T12.   Comprehensive.(Operational Failures) ................................................ *

   T13.   Electronic Trading Infrastructure and Description ............................. *

   T14.   Defendants' Litigations and Infractions ............................................. *

   T15.   Total Damage Claims ......................................................................... *

*The above Exhibits can only and will only be filed electronically

Plaintiff Ronald S. Draper ("Draper"), by his own experiences and investigation, and information and belief, allege as follows:

# I.  SUMMARY OF THE COMPLAINT

1. On November 6, 2013, Ronald S. Draper ("Draper") and his Commodity Futures Trading Partner, Bright Harry ("Harry") moved their profitable California Commodity Futures Joint Venture Trading Account from their Previous broker, OEC-Daniels Trading to KCG et al (Defendants) because OEC/Daniels Trading had a difficult Trading Platform, that did not have Exchange-traded Spreads at the time, which Defendants had. That's all, and all hell broke loose at Defendants' Brokerage. It has been a nightmare.

| Table 2 | | | |
|---|---|---|---|
| **Comparing Profits for the first 5 months of trading at OEC/Daniels Trading (Previous Brokers) and /MST/KCG or Defendants** | | | |
| **Monthly Profits at OEC/Daniels Trading Platform, from July 2013 to November 2013** | | **Monthly Profits at MST/KCG/QST Platform, from November 2013 to March 2014** | |
| **Month** | **Profit/(Loss)** | **Month** | **Profit/(Loss)** |
| July | $33,000.00 | November 2013 | $4,498.70 |
| August | $39,500.00 | December 2013 | -$12,050.90 |
| September | $9,425.00 | January 2014 | -$27,724.06 |
| October | -$53,375.00 | February 2014 | -$131,825.00 |
| November | $11,250.00 | March 2014 | -$46,340.55 |
| **Semi-Total** | **$39,800.00** | **Semi-Total** | **-$213,441.81** |
| Commissions/Fees | -$3,485.20 | Commissions/Fees | -$4,060.00 |
| **Total** | **$36,314.80** | **Total** | **-$217,501.81** |

2. From at least August 5, 2013 to April 28, 2015 ("relevant period"), through Fraudulent Concealment, Fraudulent Misrepresentations and Maliciously Fraudulent Operational Failures that violated regulations, Defendants decimated the Joint Venture Commodity Futures Trading Account of Draper and his Joint Co-Venturer, Harry, Account # TSMPF148 at KCG et al., to defraud them. Table 2 above shows the comparative analysis of the same types of Commodity Futures Spreads Harry traded at OEC /Daniels Trading and at KCG et al., with the same $275,000 Initial Good Faith Deposit, during a similar period of less than 5 months. While Harry made a profit of **$36,314.80** trading at OEC/Daniels Trading (should have been **$208,278.**86 but for the fraud and deceit of CVS/QST), he lost a

whopping **$217,501.81** within the same 5-month period, due to the immense FRAUD of Defendants, as will be explained in more details further below.

3. Although, Draper and Harry are General Partners in their Commodity Futures Joint Venture, their demands for relief are different. While Draper is seeking his Initial Good Faith Deposit of **$275,000** and Financial Elder Abuse Damage Cost, Harry is seeking his **$287,462.50** Direct Injury-In-Fact Damage Loss in combination with his Consequential Injury-In-Fact Damage Loss, ,both losses totalling more than **$45 million** (currently about $60 million or more).

4. This Case is tolled from the CFTC Tribunal, because CFTC does not have subject matter jurisdictional capacity and capability to handle Draper's Case. Furthermore, CFTC could sue only 4 of the 14 Defendants at the CFTC Tribunal, which makes no sense. At the same time, the Defendants, especially Wedbush Defendants and CFTC intentionally and maliciously trapped Draper at the CFTC Tribunal, thereby delaying Draper from joining his Joint Venture Partner (Harry) in the same Case Harry filed in this Court, on April 26, 2017

## .III. NATURE OF THE ACTION

5. This action is about the aforementioned Defendants defrauding Plaintiff Draper and his Trading Partner, Harry, before, during and after Harry's placement of buy and/or sell (purchase and/or sale) orders for Electronic Commodity Futures Spread Contracts with Defendant Computer Voice Systems Inc., through its QST Front-end Trading Platform, the Gateway to the Electronic Commodity Futures Trading Facility of the Clearing Futures Commission Merchants "(FCMs")" KCG and Wedbush, and their Affiliates, from at least August 2013 to at least April 2015 ("relevant period"). These Futures Contracts Harry placed buy and/or sell electronic orders on, within the United States, are listed on the Chicago Mercantile Exchange ("CME"), the Chicago Board of Trade ("CBOT") and the Intercontinental Exchange ("ICE"). Owing to said Defendants malicious and egregious fraud against Plaintiff and Harry, in violation of Federal Laws, the CEA, California Statutes and NFA Rules, Draper suffered Financial Loss of his Initial Trading fund or Good Faith Deposit of $275,000, Financial Elder Abuse and Emotional Distress.

# IV. BACKGROUND

## A. Formation of California Joint Venture For Trading Commodity Futures Spreads in 2009

6. Around August 2009, Draper and Harry entered into an oral joint venture agreement for the purpose of trading Commodity Futures Spreads Harry specializes in, but the 2007/2008 Economic collapse made them put the actual operation on hold. Then around May 2013, they opened their Commodity Futures Joint Venture Trading Account at OEC/Daniels Trading, under Draper's name only, with Harry having the Power of Attorney to trade for both Draper and Harry in their California Commodity Futures Trading Joint Venture.

7. By their Agreement, Draper and Harry were to share the profits or losses equally or Fifty-Fifty, and Draper was to provide the Initial $275,000 Good Faith Deposit for the Trading, while Harry provided the operational expenses, skills, knowledge, technology and carried out the actual trading 24/6. Harry was completely responsible for managing the total trading operations and Joint Venture as a whole since Draper had no knowledge of Commodity Futures Trading, and did not have the time to get involved in the trading, even if he had the know-how. Draper's hands are full with his Real Estate Business.

8. In short, Plaintiff Draper was a passive investor whose only responsibility to the Joint Venture was to provide the Initial $275,000 Initial Good Faith Deposit, while totally depending on Harry's technical and trading expertise, knowledge, technology, labour or effort, and management capabilities in trading the Commodity Futures Spreads for their Joint Venture, in their quest to make profits to share. Draper depended 100% on Harry's efforts, expertise, knowledge and management capabilities in their California Commodity Futures Spread Trading Joint Venture, with the ultimate goal of making profits to share equally.

9. On July 5, 2013, Draper deposited $275,000 in their (Draper and Harry's) California Joint Venture Commodity Futures Trading Account, # E23328, at OEC/Daniels Trading, and Harry started trading on July 15, 2013

10. The left column of Table 2 below shows the performance results of Harry's Trades at OEC Daniels Trading from July 15, 2013 to November 14, 2013.

| Table 2 | | | |
|---|---|---|---|
| **Comparing Profits for the first 5 months of trading at OEC/Daniels Trading (Previous Brokers) and /MST/KCG or Defendants** | | | |
| **Monthly Profits at OEC/Daniels Trading Platform, from July 2013 to November 2013** | | **Monthly Profits at MST/KCG/QST Platform, from November 2013 to March 2014** | |
| **Month** | **Profit/(Loss)** | **Month** | **Profit/(Loss)** |
| July | $33,000.00 | November 2013 | $4,498.70 |
| August | $39,500.00 | December 2013 | -$12,050.90 |
| September | $9,425.00 | January 2014 | -$27,724.06 |
| October | -$53,375.00 | February 2014 | -$131,825.00 |
| November | $11,250.00 | March 2014 | -$46,340.55 |
| **Semi-Total** | **$39,800.00** | **Semi-Total** | **-$213,441.81** |
| Commissions/Fees | -$3,485.20 | Commissions/Fees | -$4,060.00 |
| **Total** | **$36,314.80** | **Total** | **-$217,501.81** |

11. Owing to the difficult OEC/Daniels Trading Platform, Draper and Harry decided to move their Joint Venture to a better Trading Platform, even though they were making profits, and made more than $36,000 in less than five months as shown in the left column of Table 2.

12. On November 6, 2013, Harry and Draper opened their California Joint Venture Commodity Futures Trading Account with the Clearing Futures Commission Merchant ("FCM"), KCG Americas LLC ("KCG"), through its Introducing Broker, Main Street Trading, Inc. ("MST") and its President, Patrick Joseph Flynn ("Flynn"). This Joint Venture Commodity Futures Trading Account ("Account #TSMPF148"), belonging to Harry and Draper was opened under Draper's name only for easier tax filing with the IRS (26 U.S. Code § 701 - Partners, not partnership, subject to tax), and Harry was given the Power of Attorney to trade for both Joint Co-Venturers or General Partners to make profits to share, just like the OEC/Daniels Trading Commodity Futures Trading Joint Venture.

14. On November 14, 2013, Draper deposited similar $275,000 Good Faith Deposit at KCG for Harry to start trading, and Harry started trading on November 15, 2013, and all hell broke loose. The right column of Table 2 above shows the performance results of

1    Harry's Trades at KCG et al from November 15, 2013 to March 2013, a monumental loss of
2    more than $217,000 within the same 5 months period, due Defendants' immense FRAUD.
3    Had Draper and Harry known that Defendants were Fraudsters, Draper and Harry would
4    never have opened an Account with them and would have continued trading at OEC/Daniels
5    Trading despite the difficult Platform.

6    **Lost Profits Caused by CVS/QST Fraudulent Misrepresentations from August 12,**
7    **2013 to November 14, 2013**

8    | Table 4 | | | |
|---|---|---|---|
| **Comparing Profits for the first 5 months of trading at OEC/Daniels Trading (Previous Brokers) if CVS/QST had not distracted Plaintiff with its Fraudulent Misrepresentations about its QST Platform** | | | |
| **Monthly Profits at OEC/Daniels Trading Platform, from July 2013 to November 2013 Due to CVS/QST Fraud** | | **But for CVS/QST, the Monthly Profits at OEC/Daniels Trading Platform, from July 2013 to Nov 2013 would have been as shown** | |
| **Month** | **Profit/(Loss)** | **Month** | **Profit/(Loss)** |
| July | $33,000.00 | November 2013 | $33,000.00 |
| August | $39,500.00 | December 2013 | $39,500.00 |
| September | $9,425.00 | January 2014 | $48,000.00 |
| October | -$53,375.00 | February 2014 | $60,000.00 |
| November | $11,250.00 | March 2014 | $72,000.00 |
| **Semi-Total** | **$39,800.00** | **Semi-Total** | **$219,500.00** |
| Commissions/Fees | -$3,485.20 | Commissions/Fees | -$19,221.14 |
| **Total** | **$36,314.80** | **Total** | **$208,278.86** |

20    15. Had Defendants especially Computer Voice Systems, Inc. (CVS/QST) not
21    concealed the dysfunctionality of the QST Front-end Trading Platform, not hidden the fact
22    that this Front-end Trading Platform was not tightly integrated with ION Trading's API and
23    Backend Platform, and not misrepresented the fact that its QST Demo-Platform was not the
24    same as its QST-Live Platform, during Harry's trial of the QST Demo-Platform (August 12,
25    2013 to November 14, 2013), Draper and Harry would never have moved their Trading
26    Joint Venture from OEC/Daniels Trading to KCG et al, and Harry would have continued
27    Trading at OEC/Daniels Trading, and made a profit of **$208,278.86** instead of **$36,314.80.**
28    16. In violation of NFA Rule 2-26, MST and its President, Flynn, and KCG and

1  its Officers and Employees including Daniel B. Coleman ("Coleman"), the CEO, Carl
2  Gilmore ("Gilmore"), Head of KCG Futures (the Futures Division of KCG), and Greg
3  Hostetler ("Hostetler"), the Chief Compliance Officer of KCG Futures, knowingly and
4  willfully concealed from Harry and Draper, the Financial Malfeasances of KCG, especially
5  its near bankruptcy on August 1, 2012, the numerous litigations against KCG, and several of
6  KCG's Unlawful Conducts that violated Regulations, and opened Draper's and Harry's
7  Account. Had Flynn, Coleman, Gilmore and Hostetler not breached their Legal Duty to
8  Disclose (Fraudulent Concealment) to Plaintiff Draper and Harry, the precarious financial
9  situation of KCG and its numerous Unlawful Acts, as required by NFA Rule 2-26, Harry
10  and Draper would never have opened their Trading Account with KCG, and hence would
11  not have suffered the financial losses.

12  17. Furthermore, due to its precarious financial situation, KCG sold its Futures
13  Division, KCG Futures to Wedbush Securities, Inc. ("Wedbush") and it became Wedbush
14  Futures (the Futures Division of Wedbush) on December 1, 2014. Again, in violation of
15  NFA Rule 2-26, MST and its President, Flynn, and Wedbush and its officers and employees
16  including Edward W. Wedbush ("E. Wedbush"), the President, Carl Gilmore, now Head of
17  Wedbush Futures (the Futures division of Wedbush), and Greg Hostetler, now Chief
18  compliance officer of Wedbush futures, willfully concealed from Harry and Draper, the
19  numerous litigations against Wedbush, and several of its (Wedbush's) Misconducts in
20  violation of Federal Laws, the Commodity Exchange Act, California Laws and NFA Rules,
21  and transferred Account #TSMPF148 from KCG to Wedbush. Had Flynn, E. Wedbush,
22  Gilmore and Hostetler not breached their Legal Duty to Disclose (Fraudulent Concealment)
23  to Plaintiff Harry and Draper, the many litigations against Wedbush and it's numerous
24  violations of the Exchange Regulations, as required by NFA Rule 2-26, Harry and Draper
25  would never have allowed the transfer of their Commodity Futures Trading Account from
26  KCG to Wedbush on December 1, 2014.

27  18. These aside, the mind-boggling, egregiously manipulative fraud perpetrated
28  on Harry and Draper by Defendants, especially ION and Wedbush on April 28, 2015, forced

Harry to close out all the open trading positions in Account #TSMPF148, and to never ever trade with or have any more business dealings whatsoever with all the Defendant-Fraudsters

## B. The Legal and Technology Challenges Posed by Electronic Trading in Commodity Futures and the U.S. Regulatory Response Thereto

19. While Electronic Trading Technologies are moving at the speed of light, the new regulations to guard and guide these technologies are moving at the speed of a fast car, and the courts and judiciary responsible for adjudicating on the compliance of these technologies with existing and emerging regulations are moving at the speed of a bicycle. Hence, the chasms between the technologies and the regulations and between the regulations and the courts cum judiciary are so deep that there is confusion galore in the resolution of major problems in the commodities and derivatives market. This is the current situation in the commodities and derivatives market - confusion galore.

## C. Plaintiff's Commodity Futures Trading Business Activities

20. The trading on electronic trading platforms transmits market participant orders to a matching engine that aggregates the orders from across the market in each contract, then matches the orders to buy with orders to sell at the same price, generally following a "first-in, first-out" priority. Moreover, a relationship also exists between the price of an order and its execution. A price either can be "aggressive" or "passive" depending on where the price is located compared to the current "bid-ask spread" between the highest priced bid to buy and the lowest price offer (or "ask") to sell. A passive order cannot be immediately matched upon receipt by the Commodity Futures Exchange. Overall, the higher the limit price on a buy order, the more aggressive it is, and the lower the limit price on a sell order, the more aggressive it is.

21. The electronic trading platform also distributes information back to market participants, such as order matches and executions, cancellations, changes in sizes or quantities, and changes in prices. From the perspective of market participants trading on the electronic platform, only the number of orders at various price levels and the number of contracts at each price level are visible; the identity of the originating market participant for

each order is not. Market participants view this data through the market data feed and incorporate trading strategies based, in part, on that information.

22. My Trading Business Partner, Harry manually traded these electronic futures markets through Computer Voice Systems' QST, the Front-end Trading Platform of KCG's and later Wedbush's Electronic Commodity Futures Trading Facility. All Harry does when the right trading signal appears on his Computer Screen, based on his trading strategy, is to simply click the "blue buy- button" on the screen to buy the Commodity Futures Spread Contract or just click the "red sell-button" to sell the Contract, with his Computer Mouse. It's as simple as that.

## D. Defendants' Common Enterprise

23. Once Harry, the sole Trader of our Account, clicks his buy or sell electronic trade order button, he expects his order to be routed immediately through KCG's or Wedbush's Electronic Commodity Futures Trading Facility to the Commodity Exchanges like CME, CBOT or ICE and Cleared in milliseconds or even microseconds, almost at the speed of light. Electronic Trading is that fast even through Defendants' Common Enterprise or Electronic Trading Facility consisting of Computer Voice System's QST Front-end Platform connected to ION's RANorder Application Programming Interface (API) and Backend, which is in turn connected to the Exchange Platforms like CME/Globex. This Common Enterprise, the Electronic Commodity Futures Trading Facility is under the control and supervision of the Clearing FCMs, KCG or Wedbush. This Common Enterprise or Electronic Trading Facility of Defendants is explicitly described in Exhibit T13 (attached to Complaint), but can only be accessed or seen electronically.

## E. Defendants' Business Activities

24. Defendant QST, an Agent of the Clearing FCMs, KCG and Wedbush during the relevant period, is fully responsible for the QST Front-end Platform, the Gateway to Defendants' Electronic Commodity Futures Trading Facility, and has the obligation to always ensure that the Platform is fully functional and always tightly integrated within this Common Enterprise. Paul Sturm, as the CEO of QST is fully responsible for the overall

control and supervision of QST. Benz as VP of QST who reports to Sturm has some significant authority and supervisory roles at QST.

25. ION, an Agent of KCG and Wedbush, is fully responsible for its RANorder Application Programming Interface ("API") and Backend and is duty-bound to always ensure a seamless and tight interconnectivity between the QST Front-end and the Commodity Exchange Platforms like CME Globex. Andrea Pignataro the Global CEO of ION and Robert Sylverne, the then CEO of ION-USA are fully responsible for the overall control and supervision of the operations of ION. The FCM-defendants, KCG and Wedbush are responsible for the whole Electronic Commodity Futures Trading Facility, in terms of its constant and continuous interconnectivity, immediate remedial actions for emergencies and operational failures, and having adequate capacities and redundancies to mitigate such operational failures. As the CEO of KCG, Daniel B. Coleman is totally responsible for the overall control and supervision of the Common Enterprise or KCG's Electronic Commodity Futures Trading Facility. Also, as the CEO of Wedbush, Edward W. Wedbush is totally responsible for the control and supervision of the Common Enterprise or Wedbush's Electronic Commodity Futures Trading Facility. Furthermore, as Agents of KCG and Wedbush, Defendants MST, QST and ION are all bound by the Principal-Agent Liability.

# V. JURISDICTION

26. This action arises under the laws of the United States, and in particular, the Commodity Exchange Act, 7 U.S.C. § 1 et seq. (the "CEA"). Accordingly, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, FRCP §9(b), 7 U.S.C. §2(a)(1)(B), 7 U.S.C. §6b, 7 U.S.C. §7a-2, ), 7 U.S.C. §13c(a), CEA §6(c)(1), 18 U.S.C. §2, 7 U.S.C. §25 and **18 U.S.C. § 1962**.

27. This Court also has supplemental jurisdiction over the State law claims   pursuant to 28 U.S.C. § 1367(a), because these claims are so related to the Federal claims in this action that they form part of the same case or controversy.

28. This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000 exclusive of

interest and costs, and is between citizens of different States.

# VI. VENUE

29. Venue is proper pursuant to Judicial Code, 28 U.S.C. § 1391(a) and 7 U.S.C. § 25(c), because the events giving rise to the claims asserted herein occurred in this judicial district.

# VII. INTRADISCTRICT ASSIGNMENT

30. This Lawsuit should be assigned to the San Francisco/Oakland Division of this Court because the Account Opening Agreement was signed in Fremont, Alameda County, California, and the Events giving rise to the Claims asserted herein occurred in this Judicial District.

# VIII. PARTIES

**A. PLAINTIFF**

31. **Plaintiff Ronald S. Draper ("Draper)**, the Co-Joint Venturer of Bright Harry ("Harry") in their California Joint Venture for trading Commodity Futures Spreads is a resident of Newark, California. Draper is currently 71 years old and he was over 65 years old when he signed the Customer Future Agreement with the Clearing FCM, KCG on November 6, 2013, as shown on page 3 of the Agreement and also on page 1, where Draper stated his date of birth as 12/26/1946. Draper is seeking his Property (his $275,000 Initial Trading Capital/Good Faith Deposit) the Defendant-Fraudsters openly stole from him in broad daylight, despite knowing that he is an Elder. Draper was not involved in any aspect of the Commodity Futures Trading except providing the initial Trading Fund. Draper's Good Faith Deposit of $275,000 with the Clearing FCM-Defendant KCG is a negative investment in that, every month at least $300 was taken out of the Deposit for Trading Platform and Exchange Fees, whether Harry, the sole Trader of the Account traded or not. This means, with no activity and profit, the $275,000 would be depleted just by simply sitting idle with the Brokerage Firms, which are neither Banks nor Money Market Fund Institutions like Vanguard. Thus, Draper's only contribution to his California Commodity Futures Spreads Joint Venture with Harry was the $275,000 Good Faith Deposit, while Harry provided the

Trading System, Operational Capital and Labor Capital, for both of them to make profits to share equally. As a matter of fact, Harry not only solely traded the Futures Account but also managed the total Joint Venture on behalf of both Draper and Harry..

**B. DEFENDANTS**

32. Defendants caused Plaintiff Draper tremendous Financial Losses from his Initial Good Faith Deposit and Financial Elder Abuse, and caused Harry, Economic Injury-In-Fact, Physical/Medical Injury-In-Fact and Procedural Injury-In-Fact Damage Losses, during the relevant period, by their wantonly Unlawful Actions as alleged herein, and these Defendants include:

33. Defendant KCG Americas LLC ("KCG") --- now, and at all times herein mentioned, has been a corporation or business entity duly organized and existing under and by virtue of the State of New Jersey. It has been registered with the Commission as a broker-dealer since 2009. It is a subsidiary of Knight Capital Holdings LLC. It had a Futures Division called KCG Futures until December 1, 2014 when it sold it to Wedbush Securities, Inc., and KCG Futures became Wedbush Futures, from December 1, 2014. KCG is a Clearing FCM.

34. Daniel B. Coleman D ("Coleman") is the Chief Executive Officer of KCG Americas LLC and previously had the NFA ID Number 0296692, approved as Principal on 01/04/2000 and withdrawn on 03/31/2010. He is a controlling person of KCG Americas LLC, a registered entity with NFA and CFTC. As CEO of KCG Americas LLC, he holds and exercises direct or indirect control over KCG, and was instrumental in the sale of KCG Futures to Wedbush Securities Inc. on December 1, 2014. Also as CEO, one of his core duties is to ensure that both KCG Americas LLC and KCG Futures complied with all the relevant laws and Statutes, particularly those of the CEA and NFA.

35. Defendant Carl W. Gilmore ("Gilmore") resides in Oak Park, Illinois. Gilmore was the Head of KCG Futures, the Futures Division of KCG Americas LLC from February 2013 to December 1, 2014 and also Head of Wedbush Futures, a division of Wedbush Securities, Inc from December 2, 2014 to December 15, 2015. His NFA ID # is 0249249,

approved on 5/31/2012 as Principal for KCG Americas LLC, withdrawn on 12/1/2014, approved as Principal for Wedbush Securities, Inc. on 12/1/2014 and withdrawn on 12/15/2015. He was responsible for all aspects of managing and operating a top 30 futures commission merchant and clearing member at CME, CBOT, NYMEX, COMEX, ICE US, MGEX, KCBOT, LCH, ICE Europe. He,

- Designed and implemented strategic goals.
- Reduced operational costs by 34%, while increasing revenue by 12%.
- Reduced headcount by 40%, while increasing operational capacity by 25%.
- Reorganized and automated operations to increase efficiency and workflow.
- Designed, implemented and completed a strategic plan for returning FCM business to a cash flow positive state.
- Implemented exception management workflows.
- Re-organized and automated operational, risk, and compliance functions.
- Re-organized sales force and instituted a 5 step sales plan designed to focus sales force on specific target markets and client types.
- Reviewed and executed CEO Certification pursuant to CFTC regulations.
- Designed a project for incorporating swaps execution and clearing into the FCM, including operational, risk, compliance and financial requirements

36. Greg Hostetler ("Hostetler") resides in Madison, Wisconsin. Hostetler was the Director of Compliance at KCG Futures, a Division of KCG Americas LLC, from about 2012 to December 1, 2014. From December 1, 2014, he was the Chief Compliance Officer for Wedbush Futures, a Division of Wedbush Securities, Inc. His NFA ID Number is 0312238, approved on 5/30/2012 as Principal for KCG Americas LLC, and withdrawn on 12/1/2014. Greg Hostetler was responsible for all the Compliance issues at both KCG Futures and the later Wedbush Futures.

37. Defendant Main Street Trading, Inc. ("MST") --- now, and at all times herein mentioned, has been a corporation or business entity duly organized and existing under and by virtue of the State of California. Main Street Trading, Inc. (MST") was the Introducing

Broker to KCG Americas LLC until December 1, 2014, when KCG Futures, the Futures Division of KCG Americas LLC was sold to Wedbush Securities, Inc., and became Wedbush Futures, the Futures Division of Wedbush Securities, Inc. Main Street Trading then became the Introducing Broker of Wedbush Securities, Inc, and still is. MST was an Agent of KCG and is an Agent of Wedbush.

38. At all times herein mentioned, Defendant Patrick Joseph Flynn ("Flynn") is a natural person resident in Lake Forest, located in Orange County in the State of California. Flynn has been the President and is still the President of Main Street Trading, Inc. As President of MST, he was an Agent of KCG and is currently an Agent of Wedbush.

39. Defendant Wedbush Securities, Inc. ("WedBush") is now, and at all times herein mentioned, has been a corporation or business entity duly organized and existing under and by virtue of the State of California. Defendant Wedbush Securities Inc., the parent company of Wedbush Futures, bought KCG Futures from KCG Americas LLC on December 1, 2014, and converted KCG Futures into Wedbush Futures, its Futures Division. Wedbush is a Clearing Futures Commission Merchant ("FCM").

40. Defendant Edward W. Wedbush ("E. Wedbush") resides in Los Angeles, California. E. Wedbush is the Founder of Wedbush Securities Inc. and serves as its Chief Executive Officer and President. His NFA ID Number is 0086860, approved as Principal since 04/20/2009. As CEO of Wedbush Securities, Inc, he held and exercised direct or indirect control over Wedbush Securities, Inc., and was instrumental in the purchase of KCG Futures, which then became Wedbush Futures.

41. Defendant Computer Voice Systems, Inc. ("QST") --- now, and at all times herein mentioned, has been a corporation or business entity duly organized and existing under and by virtue of the State of Illinois. It is an Independent Software Provider to whom KCG and later Wedbush outsourced the Front-end of their Electronic Trading Facility. This front-end owned by Computer Voice Systems, Inc is the QST Platform. QST was a very critical agent of KCG and later Wedbush, and aided and abetted KCG and Wedbush.

42.Defendant Paul Sturm ("Sturm") is the Chief Executive Officer of QST and its Founder. He is a controlling person of QST, a very important Agent of KCG during the relevant Period. As CEO of QST, he holds and exercises direct or indirect control over QST Also as CEO, one of his core duties is the overall supervision of the QST Platform to ensure that is fully functionally and always connected to the Commodity Exchanges since it is the Gateway of Defendants' Common Enterprise, the FCMs' Electronic Commodity Futures Trading Facility.

43. Defendant Scott Benz ("Benz") is the Vice President of QST and has considerable influence and supervisory role at QST. He is the main contact point between QST Customers and QST Officers and Employees. He was the one that informed Plaintiff about the seamless interconnectivity of the QST Front-end Platform to the Commodity Exchanges that convinced Plaintiff to adopt the QST Platform, and to eventually choose MST and Flynn, as Plaintiff's Introducing Broker.

44. Defendant ION Trading, Inc. ("ION") is now, and at all times herein mentioned, has been a corporation or business entity duly organized and existing under and by virtue of the State of Illinois. It is an Independent Software Provider to whom KCG and later Wedbush outsourced the Interface and Backend of their Electronic Trading Facility. ION provided the RANorder Application Programming Interface ("API") that connected the QST Front-end and ION Backend to the Commodity Futures Exchanges like CME and ICE. The RANorder API and Backend are owned by ION Trading, Inc. ION is a very critical agent of KCG and later Wedbush, and aided and abetted KCG and Wedbush in their fraudulent and Unlawful Acts that violated Regulations.

45 Defendant Andrea Pignataro ("Pignataro") is the Global Chief Executive Officer of ION, which has operations in many Countries of the World including the United States, where ION has locations in many States including Illinois. He is a controlling person of ION Globally and in the United States. As Global CEO of ION he holds and exercises direct or indirect control over ION. Also as Global CEO, he has the overall supervisory role of ensuring the continuous functionality and constant interconnectivity of his Software

Platforms that connect other Trading Platforms with the Exchange Platforms. He also has the overall responsibility of ensuring that ION has adequate computing capacity and redundancies to mitigate emergencies and operational failures of his Software Platforms, critical to the electronic order flow.

46. Defendant Robert Sylverne ("Sylverne") is the Chief Executive Officer of ION in the United States and he is located in Chicago, Illinois. He is a controlling person of ION in the United States. As CEO of ION-USA he holds and exercises direct or indirect control over ION in the United States. Also as CEO, he has the overall supervisory role of ensuring the continuous functionality and constant interconnectivity of ION Software Platforms, especially the RANorder Application Programming Interface, (API) and Backend that connect other Trading Platforms like QST with the Exchange Platforms. He also has the overall responsibility of ensuring that ION has adequate computing capacity and redundancies to mitigate emergencies and operational failures of ION's Platforms, critical to the electronic order flow.

47. The acts alleged in this Complaint to have been committed by the Defendants KCG, Coleman, Gilmore, Hostetler, Wedbush, E. Wedbush, MST, Flynn, QST, Sturm, Benz, ION, Pignataro and Sylverne (hereinafter all collectively referred to as "Defendants") were authorized, ordered, or done by their directors, officers, agents, employees, or representatives while actively engaged in the management of the Defendants' governance and operations.

## C. OTHER PARTIES OF INTEREST

48. **Bright Harry ("Harry")** is the Joint Co-Venturer of Plaintiff Draper in their California Commodity Futures Trading Joint Venture for trading Commodity Futures Spreads Harry specializes in. Harry, the Executor of the contract between Harry and Draper, and the FCM-Defendants, KCG and Wedbush, suffered Economic Injury-In-Fact, Physical-Medical Injury-In-Fact and Procedural Injury-In-Fact Damage Losses during the relevant period, caused by the egregiously malicious Unlawful Acts of Defendants as alleged herein. At all times herein mentioned, Harry is a natural person resident in Fremont, located in

Alameda County in the State of California. Harry is Draper's trading Partner who actually traded the Commodity Futures Spreads in Account #TSMPF148, belonging to Harry and Draper, but under Draper's name. Harry was the sole Trader of our Account, who placed the buy and sell electronic orders for futures contracts at CME, CBOT and ICE during the relevant period, through Defendants, and was damaged by Defendants' fraud and other unlawful Acts that violated Federal Laws, the Exchange Act, California Laws and NFA Rules. Harry is an Engineer by Profession and ran his own Engineering Companies for more than a decade, and specializes in Commodity Futures Spread Trading as a sideline, and for the challenge.

49. **NFA** is a self-regulatory organization for the futures industry. As such, the NFA develops trade practices, oversees and enforces compliance of NFA rules, and serves as the registration authority for the Futures Industry. Membership is mandatory and the Clearing FCM-Defendants, KCG and Wedbush are registered Entities and are bound by the rules of the Agency. MST, Flynn, E. Wedbush, Gilmore and Hostetler were registered Members of NFA during the relevant Period, and are also duty-bound to comply with the Rules of the Agency.

# IX.   FACTUAL ALLEGATIONS

## A. FRAUDULENT CONCEALMENT

**A1. Fraudulent Concealment by Defendants MST, Flynn, and KCG and its officers, employees, and agents, especially Coleman, Gilmore and Hostetler, prior to opening Harry's and Draper's commodity futures trading Account**

50. Plaintiff re-alleges and incorporates each preceding and succeeding paragraph of the allegations with the same force and effect as if fully restated herein.

51. On November 6, 2013, Clearing FCM-Defendant KCG Americas LLC ("KCG"), through its Agent, Patrick Joseph Flynn, President of Main Street Trading, Inc ("MST"), the Introducing Broker, entered into a Customer Futures Agreement with Plaintiff Draper and his Trading Business Partner, Harry, without Flynn and KCG providing Harry and Draper with information about KCG's business, operations, risk profiles, affiliates, and litigations against it, that were material to Harry's and Draper's decision to open an Account with and

do business with KCG, as required by NFA Rule 2-26. Thus, Defendants, especially the Clearing FCM-Defendant KCG violated NFA Rule 2-26 even before the Customer Futures agreement was signed, to defraud Plaintiff Draper and his Trading Business Partner, Harry, as explicitly detailed below.

52. From about November 1, 2013 through April 28, 2015, Main Street Trading, Inc. ("MST"), an NFA-registered introducing broker ("IB"), through its employee and President, Patrick Joseph Flynn ("Flynn"), and Flynn directly, engaged in acts and practices that violated Section 4b of the Commodity Exchange Act (7 U.S.C.§ 6b) (the "Act"), NFA Rule 2-26 and CEA § 6(c)(1). Specifically, Flynn, while acting on behalf of Main Street Trading, Inc., and in conjunction with his chosen, Clearing-FCM, KCG America's LLC, ("KCG",) failed to provide Plaintiff Harry and Draper any information about KCG's business, operations, risk profiles, affiliates, and litigations against it, before opening their Commodity Futures Trading Account ("Account #TSMPF148") on November 6, 2013, violating NFA Rule 2-26.

53. Flynn committed the acts and omissions described herein within the course and scope of his employment at MST, and as an agent of KCG. Subsequently, KCG Americas LLC is liable under Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), as principal for its agent's acts constituting violations of the Act.

54. Furthermore, from about November 6, 2013 to December 1, 2014, Clearing FCM-Defendant KCG Americas LLC, ("KCG") by and through its agents, officers, or persons acting within their employment, agency, or office with KCG, including its CEO, Daniel B. Coleman, its Head of KCG Futures, Carl W. Gilmore, and its Chief Compliance Officer, Greg Hostetler, failed to provide Plaintiff Harry and Draper, the required information about KCG's business, operations, risk profiles, affiliates, and litigations against it, before opening the Trading Account #TSMPF148 on November 6, 2013, thus, violating NFA Rule 2-26, while concealing very critical material facts from Plaintiff and Draper, thereby violating CEA § 6(c)(1).

55. Daniel B. Coleman, Carl W. Gilmore, and Greg Hostetler committed the acts and omissions described herein within the course and scope of their employment at KCG

Americas LLC. Subsequently, KCG Americas LLC is liable under Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), as principal for its agents' acts constituting violations of the Act.

56. Had MST and Flynn, and KCG through its agents, MST and Flynn, and through its Officers, Daniel B. Coleman, Carl W. Gilmore, and Greg Hostetler not violated NFA Rule 2-26, Plaintiff Harry and Draper would have known of the fraudulent, concealed material facts about KCG as described below, and hence, would never have opened a Commodity Futures Trading Account with KCG. By Harry and Draper not opening such a Futures Trading Account with KCG, the aforementioned Defendants would not have been able to further commit the following violations: **Federal Statutes:** FRCP §9(b), 7 U.S.C. §2(a)(1)(B), 7 U.S.C. §6b, 7 U.S.C. §7a-2, 7 U.S.C. §13c(a), CEA §6(c)(1), 18 U.S.C. §2 and 7 U.S.C. §25; **California Statutes:** CCC §1572, CCC §1573, CCC §1709, CCC §1710, and CCC §3294; and **NFA Rules:** 2-2, 2-4, 2-9, 2-29, 2-30, 2-38, to defraud Plaintiff Harry and Draper

57. This is not the first time Defendants, especially the FCM-Defendants have used their collective monopoly over their Electronic Trading Facility to manipulate the market to defraud their Customers. As a matter of fact, the FCM-Defendants prior unlawful acts are similar to the current unlawful acts against Plaintiff and Harry.

58. The Clearing FCM-Defendants, KCG and Wedbush, separately, have been investigated, sued and fined by SEC, CFTC, FINRA and NFA, and even by individual Traders, for their unlawful acts in Securities Transactions and Commodity Futures Trading Misconducts, violating Exchange Regulations, NFA Regulations and State Statutes, encompassing egregious manipulative frauds. The following is a list of such investigations, litigations and fines or penalties, starting with KCG, and followed by Wedbush.

**KCG**
a) Class action suit against KCG for Misrepresentations and lack of appropriate enterprise-wide risk controls in Electronic Trading that led to massive losses."[CASE NO. 2:12-cv-06760-SDW-MCA]"

b) SEC v. Knights Capital Americas LLC Administrative Proceeding , File No. 3-15570, on October 16, 2013. Operational Failures, especially Market Access Failures that violated the Exchange Act.

c) From Reuters of April 9, 2015: **Exclusive: U.S. investigates market-making operations of Citadel, KCG.** Federal authorities are investigating the market-making arms of Citadel LLC and KCG Holdings Inc, looking into the possibility that the two giants of electronic trading are giving small investors a poor deal when executing stock transactions on their behalf. "[The Justice Department has subpoenaed information from Citadel and KCG (KCG.N) related to the firms' execution of stock trades on behalf of clients, according to people familiar with the investigation]". "[The documents subpoenaed from KCG related to the firm's market making activities from 2009 to 2011, according to a person familiar with the KCG probe......]".

d) Class Action Suit against KCG and others for violation of Securities Laws, filed 06/13/2014 [Case 1:14-cv-04321-JM].

**A2. Fraudulent Concealment by the Introducing Broker, MST and its President, Flynn, and Wedbush and its Officers, Employees and Agents, before transferring Harry's and Draper's Account #TSMPF148 from KCG to Wedbush**

59. From December 1, 2014 to April 28, 2015, Clearing FCM-Defendant Wedbush Securities, Inc, ("Wedbush") by and through its agents, officers, or persons acting within their employment, agency, or office with Wedbush, including its CEO and President, Edward W. Wedbush, its Head of Wedbush Futures, Carl W. Gilmore, and its Wedbush Futures Chief Compliance Officer, Greg Hostetler, failed to provide Plaintiffs Draper and Harry, the required information about Wedbush's business, operations, risk profiles, affiliates, and litigations against it, before transferring Plaintiffs' Commodity Futures Trading Account TSMPF148 from KCG Futures (a Division of KCG Americas LLC) to Wedbush Futures (a Division of Wedbush Securities, Inc.) on December 1, 2014, violating NFA Rule 2-26, while. also concealing very critical material facts from Plaintiff, about the regulatory malfeasances of Wedbush and the numerous litigations against it, thereby violating CEA §6(c)(1).

60. Edward W. Wedbush, Carl W. Gilmore, and Greg Hostetler committed the acts and omissions described herein within the course and scope of their employment at Wedbush Securities, Inc., and as officers of Wedbush. Thus, Wedbush Securities, Inc. is liable under

Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), as principal for its agents' acts constituting violations of the Act.

61. Had Wedbush through its Officers, Edward W. Wedbush, Carl W. Gilmore, and Greg Hostetler not violated NFA Rule 2-26, Plaintiff Harry and Draper would have known of the fraudulent Misconducts of Wedbush in the Securities and Futures businesses and the numerous lawsuits against Wedbush as listed below.

**WedBush**

a) SEC vs. Wedbush, **[Administrative Proceeding, File No. 3-15913].**

b) FINRA Charges Wedbush Securities for Systemic Market Access Violations, Anti-Money Laundering and Supervisory Deficiencies, FINRA, August 18, 2014.

c) SEC Sues Wedbush Securities and Dark Pool Operator Liquidnet Over Regulatory Violations, Institutional Investor Securities Blog, June 6, 2014

d) Wedbush ordered to pay $3.5M for 'morally reprehensible failure', Investment News, July 11, 2011.

e) **Wedbush to Pay Trusts, Family Members Over $813,000**
A Financial Industry Regulatory Authority Panel says that Wedbush securities and investment advisor Kevin Thomas Scarpelli must jointly and severally pay several investors over $813,000 to resolve allegations of professional negligence and failure to supervise (November 18, 2015).

f) Wedbush has been named in at least 53 regulatory events and 52 arbitrations. Failure to supervise was a common complaint.

62. The above legal precedents corroborate Plaintiff Draper's factual allegations and affirm the indisputable facts that Defendants, especially the FCM-Defendants are deceitful and extremely fraudulent, and knowingly, intentionally or willfully and maliciously defrauded Plaintiff Draper. Had Harry and Draper known of these facts about Clearing FCM Wedbush, they would never have allowed the transfer of their Commodity Futures Trading Account from KCG Futures to Wedbush Futures. By Harry and Draper stopping this transfer, the above-mentioned Defendants would not have had the opportunity to further defraud Plaintiff, and continue their offenses against Draper, further violating **Federal Statutes:** FRCP §9(b), 7 U.S.C. §2(a)(1)(B), 7 U.S.C. §6b, 7 U.S.C. §7a-2, ), 7 U.S.C. §13c(a), CEA §6(c)(1), 18 U.S.C. §2 and 7 U.S.C. §25;. **California Statutes:** CCC §1572, CCC §1573, CCC §1709, CCC §1710, and CCC §3294, and **NFA Rules:** 2-2, 2-4, 2-9, 2-29, 2-30, 2-38.

## B. **DEFENDANTS' FRAUDULENT MISREPRESENTATIONS**

63. Plaintiffs re-allege and incorporate each preceding and succeeding paragraph of the allegations with the same force and effect as if fully restated herein.

### Defendant Wedbush's Advertisements and Promotions on its Websites, in sharp contrast to its unlawful actions

64. Defendant Wedbush through its websites, has disseminated or has caused to be disseminated advertisements and promotional materials about its functions, capabilities, capacities and Trading Facilities as a Clearing FCM and Market Maker. These advertisements and promotions contain the following statements:

### (i) Wedbush Services

**CLEARING AND EXECUTION**

**Relentless Service**
Our unparalleled **dedication** to your financial success. A relationship built on **trust**, supported by a firm built on **experience, stability**, and **innovation**

**Brokerage & Advisor**
We offer a comprehensive suite of customizable technology solutions. These innovations, combined with our extensive industry experience and access to third party resources, allow you to spend less time worrying about operations and more time focusing on your client relationships. We welcome the opportunity to showcase our services and learn how we can be of assistance.

**Capabilities**
As members of the Depository Trust & Clearing Corporation (DTCC), National Securities Clearing Corporation (NSCC), Options Clearing Corporation (OCC), Euroclear, and all major exchanges including the New York Stock Exchange (NYSE), we are well-positioned to execute on your needs.

**Technology**
All of our technology solutions are designed with productivity and efficiency in mind. We focus on in-house development to ensure that we offer the highest quality and most dynamic products in the marketplace. Wedbush products, Broker Insight$^{TM}$ and ClientLink$^{TM}$, provide exceptional account management tools that are in demand by reps and clients alike.

**Trading & Market Automation**
We understand your need for efficiency in operations, consistency in performance, and transparency in both process and economics. Our services and innovative tools were built on these concepts to provide a complete solution that is unrivaled in the industry.

**Sponsored & Direct Market Access**
Wedbush's broad market access, expertise, and integration with leading order management

systems make us the best choice for your sponsored or direct access needs. We are consistently a top volume provider to all major exchanges, which enables us to help reduce execution costs and increase rebate income.

**Technology**
Our in-house technology development team ensures that we stay ahead of the curve and highly responsive to our clients' needs. We build custom solutions to optimize our trade reconciliation and settlement process, compliance reporting, risk management, and third party integration.

**Risk Management**
To carefully monitor trading exposure, we utilize industry-leading real-time risk management controls. Our experienced team works closely with clients to provide best-practice consulting and insight to regulatory concerns.

**Direct Market Access**
Wedbush provides Direct Market Access to qualified clients who require the high performance and ultra-low latency networks. Our dedicated risk management team continually monitors trading activity ensuring proper risk levels at the trader, client and firm level.

**KFIX API**
Wedbush Futures' proprietary KFIX API offers advanced electronic trading

capabilities that allow clients to integrate their management system, algorithmic black box, or third-party front end. As a single point of connectivity to exchanges and counterparties around the world, our KFIX API maximizes speed of execution and pre-trade risk management.

We also support APIs from other software vendors.

**Defendant KCG's Advertisements and Promotions on its Websites, in sharp contrast to its unlawful actions**

**(ii) KCG Futures**

65. The advertisements and promotions under **(i) Wedbush Services** are similar to those of KCG Futures as of December 1, 2014, when KCG Futures, a wholly-owned subsidiary of KCG became Wedbush Futures, a wholly-owned subsidiary of Wedbush Securities. Thus, whatever is mentioned under **(i) Wedbush Services** is applicable to KCG, as the previous FCM to Plaintiff.

66. As shown in paragraphs 63 and 64, both FCM-Defendants Wedbush and KCG claim "relentless service", "unparalleled dedication to your financial success", '[Our] broad market access, expertise, and integration with leading order management systems make us

the best choice", "Our services and innovative tools were built on these [efficiency in operations, consistency in performance, and transparency in both process and economics] concepts to provide a complete solution that is unrivaled in the industry" and "To carefully monitor trading exposure, we utilize industry-leading real-time risk management controls". "Our dedicated risk management team continually monitors trading activity ensuring proper risk levels at the trader, client and firm level", and finally, "As a single point of connectivity to exchanges and counterparties around the world, our KFIX API maximizes speed of execution and pre-trade risk management. We also support APIs from other software vendors".

67. These advertisements and promotions by FCM-Defendants Wedbush and KCG are in sharp contrast to all the allegations against Defendants of their grossly dysfunctional API, wanton inefficiency, callous recklessness, and unconscionable underperformance in their Commodity Futures Operations, throughout the relevant period. In short, FCM-Defendants Wedbush and KCG's Misrepresentations are a monumental fraud that violated **Commodity Exchange Act 7 U.S.C. § 6b.**

## Defendant ION Trading's Advertisements and Promotions on its Websites, in sharp contrast to its unlawful actions

### (iii) ION Trading

68. ION Trading advertises and promotes its services, capabilities, capacities and technologies on its website as follows:

"[ION is a global market leader in providing innovative, high performance, real-time solutions across multiple asset classes for electronic trading, position management, pricing, risk management and downstream processing to clients which range from global financial institutions to leading niche financial specialists.

With offices in the leading financial centres of London, New York, Tokyo, Frankfurt, Paris, Madrid, Toronto and further offices in Chicago, Singapore, Ireland, Italy, India and Australia, the company has a global reach enabling it to support customers' local needs wherever they are.

**Fault Tolerance**
The ION platform guarantees the availability of the system by using sophisticated process management procedures that allow for a flexible and dynamic allocation of processes on machines, and for automatic reaction to failure (auto failover).

At the core of the High Availability features are the Process Manager (PM) and the Configuration Server (CS) components. These components respectively support the configuration of a platform with automatic failover characteristics and the propagation of the platform events which trigger the failover reactions.

PM components and the ION APIs allow the configuration of automatic failover. PMs are also used to distribute components across the various servers to balance the load]".

69. As shown in paragraph 59, Defendant ION Trading advertises and promotes itself as "a global market leader in providing innovative, high performance, real-time solutions across multiple asset classes for electronic trading, position management, pricing, risk management and downstream processing to clients which range from global financial institutions to leading niche financial specialists".

70. Defendant ION Trading claims "innovativeness", "high performance", "real-time solutions" and "risk management", which are in sharp contrast to the period, in the preceding and succeeding paragraphs, where Defendant ION Trading had horrendous and reckless performances, could not execute trades even in days, not to talk of real-time, and failed woefully in terms of risk management. In other words, Defendant ION Trading's Misrepresentations are an immense fraud, in violation of the **Commodity Exchange Act 7 U.S.C. § 6b.**

## Defendant QST's Advertisements and Promotions  on its Websites, in sharp contrast to its unlawful actions

### (iv) Computer Voice Systems, Inc. ("QST")

71. Defendant Computer Voice Systems, Inc ("QST") advertises and promotes its trading platform's capabilities, capacities and technologies on its website as follows:

"[Quick Screen Trading offers revolutionary software applications for real-time streaming futures and options on futures quotes, highly reliable and accurate data, internet based mobility for anytime/anywhere access, professional, advanced tools, the best combination of sophistication, usability, performance and price.

**Executive Overview**
QST is a revolutionary futures trading application that combines comprehensive, fast and flexible order entry/order management with world-class charting and analytics, real-time quotes and news.

Order entry is pervasive throughout QST. From virtually any screen, you can enter and manage orders and fills.

Integrated paper trading allows users to learn to use the interface and practice trading strategies. With the click of a button, users can toggle between paper and live trading.

One application can consolidate order flow on Ion Trading's RANorder, or Trading Technologies, and CQG's FIX Adapter, and soon to be OAK. This gives you the flexibility to route your order flow through a single network, fully utilizing its firm-wide risk control.

The very same application gives you fully redundant access to market data replacing Futuresource, eSignal, ProphetX, DTN or any other quote terminal products.

**Application Features**
Efficient, intuitive and consistent order entry: left click = buy, right click = sell. Unlike other products that display useless eye candy, the order entry function is simple and concise. It is truly a "single action" operation.]"

72. As shown in paragraph 71, Computer Voice Systems, Inc. ("QST") claims "revolutionary futures trading application that combines comprehensive, fast and flexible order entry/order management with world-class charting and analytics, real-time quotes and news", "From virtually any screen, you can enter and manage orders and fills", "One application can consolidate order flow on Ion Trading's RANorder .....{which}..... gives you the flexibility to route your order flow through a single network, fully utilizing its firm-wide risk control.", and finally, " Efficient, intuitive and consistent order entry, left click = buy, right click = sell. Unlike other products that display useless eye candy, the order entry function is simple and concise. It is truly a "single action" operation".

73. Throughout the preceding and succeeding Paragraphs of these allegations, the most prominent standout is the totally dysfunctional Defendant ION Trading's RANorder that connects the QST Front End Platform to the Back End which in turn connects to the Commodity Futures Exchanges. The highly dysfunctional RANorder is the deadliest API, Plaintiff had ever come across. It is thus shocking to say the least, for Defendant QST to advertise that "One application can consolidate order flow on ION Trading's RANorder ..... [giving] you the flexibility to route your order flow through a single network. Defendant ION Trading's RANorder failed woefully to route Plaintiffs Electronic Trade Orders in numerous instances and for 17 months. This is a monumental Misrepresentation by Defendant QST and hence a fraud.

74. Furthermore, Defendant QST claims, "Efficient, intuitive and consistent order entry: left click = buy, right click = sell. Plaintiff clicked the blue left button to buy or the red right button to sell on numerous occasions on the QST Platform, during the relevant period, but Plaintiff's trade Orders were neither routed nor cleared in time or filled at all through the Commodity Futures Exchanges. This is the crux of this case.

75. Paragraphs 71, 72, 73 and 74 are in sharp contrast to the allegations throughout the preceding and succeeding paragraphs, thereby confirming that QST misrepresented facts that were very detrimental to Plaintiff and in the process committed fraud, in violation of the **Commodity Exchange Act 7 U.S.C. § 6b.**

76. Besides the above Fraudulent Misrepresentations, in July/August 2013, Plaintiff's Partner, Harry contacted Defendant Scott William Benz ("Benz"), VP of Computer Voice Systems, Inc. ("QST") to test out their QST Trading Platform with regards to its capabilities in Commodity Futures Spread Trading. Thus, for the next three months, starting from August 12, 2013 to November 12, 2013, Harry tested the QST-DEMO Platform, and it was phenomenal in the creation of Exchange-Traded Commodity Futures Candlestick Spread Charts and in the actual execution of Spread Trades on the QST Virtual (Simulated) Commodities Exchange like CME, CBOT and ICE.

77. Benz also informed Harry that the QST- LIVE Platform was tightly integrated with ION Trading's RANorder API and Backend that connect to the Real Commodity Exchanges like CME, CBOT, ICE and others. Benz emphasized that trading on the QST-DEMO Platform was not any different from trading on the QST-LIVE Platform, and that with the click of a button, Harry could switch from the QST-DEMO (Paper Trading) to the QST-LIVE (Live Trading). Again, the following on the QST website corroborate Benz's statement:

- QST is a revolutionary futures trading application that combines comprehensive, fast and flexible order entry/order management with world-class charting and analytics, real-time quotes and news.
- Order entry is pervasive throughout QST. From virtually any screen, you can enter and manage orders and fills.

- Integrated paper trading allows users to learn to use the interface and practice trading strategies. With the click of a button, users can toggle between paper and live trading.
- One application can consolidate order flow on Ion Trading's RANorder, or Trading Technologies, and CQG's FIX Adapter, and soon to be OAK. This gives you the flexibility to route your order flow through a single network, fully utilizing its firm-wide risk control.

78. Benz's Deception and Misrepresentations, especially during the 3-month trial of the QST-Demo were instrumental to Plaintiff and Harry choosing the QST Platform

79. In September/October 2013, Draper's Trading Partner, Harry asked Benz to recommend a California Commodity Futures Brokerage Firm that uses the QST Platform as the Front-end of its Electronic Commodity Futures Trading Facility. Benz recommended Main Street Trading, Inc ("MST") and Patrick Joseph Flynn ("Flynn"). Harry then contacted Flynn to get more details about MST and how the electronic order execution works at MST using the QST Front-end Platform. Just like Benz, Flynn told Harry that the QST-DEMO Platform and the QST-LIVE Platform were very similar, and that with the click of a button, Harry could switch from the QST-DEMO Platform (Paper Trading) to QST-LIVE Platform (Live trading). Flynn also added that QST was tightly and securely connected to the ION Trading Backend that connects to the Commodity Exchanges. Flynn's MST website corroborates these statements with the following excerpts:

> MSTonline features the ability to enter and manage orders and fills from virtually any screen. It also offers integrated paper trading, allowing users to learn the MSTonline interface and practice trading strategies. With the click of a button, users can toggle between paper and live trading.

80. The following email from Flynn on November 8, 2013 further corroborates Flynn's promise of the interconnectivity of QST to RAN and the Exchanges;

"P. O. A. & RETIREMENT & DISCLOSURE

Patrick Flynn
Fri 11/8/2013, 10:33 AM You; RONALD DRAPER (rsdraper@gmail.com)
Dear Ron and Bight,

Thank you both very much. We are all set pending funding. As you recall, I sent the wiring instructions and formal account number to you both yesterday afternoon. I will contact

once the account has been funded and will assist as best I can with helping to secure your connectivity with QST and RAN.

Regards,

# Patrick Flynn

Main Street Trading
800 748-5083 ext 7450
949 268-7800

THE RISK OF LOSS IN FUTURES TRADING CAN BE SUBSTANTIAL. THEREFORE, ONLY GENUINE RISK CAPITAL SHOULD BE USED FOR TRADING PURPOSES. FUTURES AND FUTURE OPTIONS MAY NOT BE SUITABLE FOR ALL INVESTORS. YOU SHOULD CAREFULLY CONSIDER YOUR FINANCIAL CONDITION WHEN DECIDING WHETHER TO TRADE. PAST PERFORMANCE, PROJECTED OR HYPOTHETICAL RESULTS ARE NOT NECESSARILY INDICATIVE OF FUTURE RESULTS."

81. With these assurances and presentations by Benz and Flynn, and backed by the phenomenal performance of the QST-demo front-end trading platform in creating Exchange-Traded Spreads and Exchange-Traded Spread Charts, combined with the fast execution on the Simulated or Virtual Commodity Exchanges, Harry convinced his Trading Business Partner, Draper for them to open a Commodity Futures Trading Account with MST's and Flynn's Clearing FCM, KCG. Thus, on November 6, 2013, the Trading, Account #TSMPF148 was opened. Draper then wired $275,000 into the Account and Harry attempted his first live trade on November 15, 2013.

## B1. Defendants' Fraudulent Misrepresentations Proven by the Consistent Pattern of Failure of their Electronic Trading Facility, Platforms and Computer Servers in 2013

82. Plaintiff re-alleges and incorporates each preceding and succeeding paragraph of the allegations with the same force and effect as if fully restated herein.

83. At about 10:00 a.m on November 15, 2013, Harry clicked the QST-LIVE button and thus switched from the QST-DEMO to the QST-LIVE as shown in Exhibit 1 above and in the "Comprehensive Exhibits" File Folder, entitled, **"Screen Print of order entry problems on November 15, 2013"**. Harry was attempting to place buy orders for 20 contracts of 2014 July/November Soybean Spreads and 20 contracts of 2014 July/December Soymeal Spreads. As can be seen on the screenshot above, Defendant QST's Platform did not perform as promised and Plaintiff was unable place his orders. In other words,

1   Defendants were unable to route and clear Plaintiff's Trade Orders through the Commodity

2   Futures Exchanges on 11/15/2013, as they promised that with the click of a button, Harry

3   could switch from the QST-DEMO to QST-

4   LIVE. Defendants failed to resolve this platform problem for the whole of 11/15/2013.



**Exhibit 1: Screen Print of order entry problems on November 15, 2013**

19   84. From about 5::00 P.M. on November 17, 2013 into the early Morning hours of

20   November 18, 2013, Harry attempted to place the same orders as of November 15, 2013 but

21   with no success. Defendant QST's Platform and hence KCG's Electronic Trading Facility

22   was still dysfunctional. As shown in Exhibit 2 below and in the "Comprehensive Exhibits"

23   File Folder, entitled, **"RAN Linking Configuration Problems of November 17, 2013"**,

24   Plaintiff attempted to place his previous orders again at 6:41 a.m. on November 18, 2013 but

25   was unable because of Defendants' non-functional Trading Platform and Electronic Trading

26   Facility. The QST Platform access problem was corrected at about 7:20 a.m. on November

27   18, 2013 with a change of IP/DNS Address. Benz gave Harry the wrong IP/DNS Address.

85. Harry could still not trade Commodity Futures Spreads on the Defendants' Electronic Trading Facility on November 19, 2013 and hence, Harry experimented with naked contracts by placing an order for 20 naked contracts of January 2014 Soybeans. This naked commodity order was successful and Harry closed out the positions on November 21, 2013.



**Exhibit 2: RAN Linking Configuration Problems of November 17, 2013**

## Trading Problems for November 21, 2013

Alina Redli
To: bharry88@yahoo.com
CC: quotes_support@computervoice.com  quotesgui@computervoice.ro
Nov 21, 2013

Hello,
Our development team found the problem and they are already working to fix it.

We will make an update in the weekend that will include the fix so everything should be working fine next week.

Thank you for reporting this and sorry for any inconvenience.

--
Regards,

Alina Redli
QST Support

On 11/21/2013 9:58 AM, bharry88@yahoo.com wrote:

Placed a Spread order to sell 20 ZSF14:N14 @ 24.00 but the order was filled at (-24.00). In other words, instead of a ZSN14 buy @1253^0 and a ZSF14 sell @1279^0, ZNSF14 was bought wrongly @1303^0 and ZSF14 sold correctly @1279^0. I executed this trade as Paper trading instead of live because i was having issues with the live trading. This is really scary, having a $48,000 plus loss because of a software snaffu.

ZSF14:N14 Spread SOLD @24.00

ZSN14 Buy WRONGLY PLACED @1303^0 instead of 1253^0

ZSF14 CORRECTLY SOLD @1279^0

**Exhibit 3**

86. On November 21, 2013, Harry placed an electronic order for 20 contracts of 2014 January/July Soybean Spread but Defendants' Electronic Trading Facility failed to accept the order as shown above in Exhibit 3. Thus, Harry placed the same electronic order on the QST Demo Platform just to test the QST Trading Platform. As shown on Exhibit 3 above and in the "Comprehensive Exhibits" File Folder, entitled, " **Trading Problems for November 21, 2013**", Defendants' QST-Demo Platform itself failed for the first time. In other words, Defendants again failed to route and clear Plaintiff's Trade Orders through the Commodity Futures Exchange from 11/21/2013 to 11/28/2013, as confirmed by Alina Redli, an employee of QST. Hence, Harry missed the best opportune times to enter the lucrative, seasonal July/November 2014 Soybean Spread and July/December 2014 Soymeal Spread. $394,400 is the total loss of these missed trade opportunities to Plaintiff, as shown in Exhibits 5a-1, 5a-2, 5b and 5i in the Computer File Folder entitled, **"Plaintiffs' Damage Claims and Method of Calculating Damages"**.

87. From November 15, 2013 to December 26, 2013 the disconnections of the ION Trading RANorder Interface between the QST Platform and the Commodity Futures Exchanges were simply mind-boggling. The number of disconnections in just two months were so staggering that Plaintiff lost count of them. Plaintiff was no longer certain if

1  Defendants would successfully route and clear his trade Orders as confirmed by Exhibit 4,

2  entitled, **RAN Problem on December 26, 2013**", below and in the "Comprehensive

3  Exhibits" File Folder.

4  **RAN Problem on December 26, 2013**

5  At about 9:35 p.m. California time, RAN was delinked from QST, while I was
   attempting to execute . ZSF14 was gradually going up and I wanted to cancel my order (buy

6  at 13.1250). Could not. Called KCG and spoke with Mark who told me that it
   was a QST problem. While he was looking at the problem, I rebooted the QST Software and

7  the problem was resolved. Unfortunately, the market had gone too high for me to create the
   protective ZSH14 - ZSF14 Spread.

8
                                    **Exhibit 4**

9      88. Plaintiff and Harry were utterly confused and powerless to change the situation

10 because no other Firms besides QST/KCG had Exchange-Traded Spreads in combination

11 with Exchange-Traded Spread Charts during the relevant period, and Harry could not route

12 and clear his own Trade Orders through the Commodity Futures Exchanges. Harry could

13 only click to buy or sell, nothing more. Draper and Harry were at the mercy of Defendants

14 who kept promising that the routing and clearing problems will be fixed or assuring that the

15 problems have been fixed, as 2013 came to an end, and the new year of 2014 began.

16 **B2. Defendants' Fraudulent Misrepresentations Proven by the Consistent Pattern of**
17 **Failure of their Electronic Trading Facility, Platforms and Computer Servers in 2014**

18     89. After the nightmare of 2013, and with assurances from Defendants that whatever

19 problems they had with their Electronic Trading System had been fixed, Plaintiff and Harry

20 were hopeful that the new year of 2014 would be a better year. In other words, Defendants

21 would finally exercise their Fiduciary Duty to Plaintiff and Harry by promptly filling his

22 Trade Orders when Harry clicks the "buy" or "sell" button. Unfortunately the new year did

23 not bring Plaintiff and Harry good tidings as the violations of Defendants continued.

24     90. 2014 begins with Exhibit A1-a shown in the "Comprehensive Exhibits" File

25 Folder, entitled, **"Trading Problems of January 3, 2014"**. This is an email correspondence

26 between Defendant QST and Harry with regards to another break or disconnection of ION

27 Trading's RANorder link to the exchange on 1/2/2014 and 1/3/2014, preventing Harry from

28 closing out their positions, resulting in a humongous loss.

91. Exhibit A1-b, in the "Comprehensive Exhibits" File Folder. entitled "**uploaded client logs from BHarry (03/Jan/2014 13:06:00 -> 03/Jan/2014 13:07:00) (6)**" gives more comprehensive email exchanges between Defendant QST and Harry. In both Exhibits A1-a and A1-b, Defendant QST showed a screenshot pointing at where to select the right Account in the Account List for trading, as if that was the problem. The Account List was totally blank and hence, impossible to select from a non-existent menu.

92. Exhibit A3 shown in the "Comprehensive Exhibits" File Folder, entitled "**Trading Problems of October 22, 2014**", confirms and corroborates the same problem of January 2, 2014 and January 3, 2014 --- blank drop-down box with no Account Menu to select from. The screenshot at the top states "invalid username or password", while the bottom screenshot is totally blank. Plaintiff did not change any information on his side for this to occur on October 22, 2014, as happened on January 2, 2014 and January 3, 2014.

93. This was the same occurrence on December 26, 2013 as shown by Exhibit 4 in B1 of 2013, entitled "**RAN Problem on December 26, 2013**". Defendant ION Trading's RANorder link to the Commodity Futures Exchange was also broken on December 26, 2013. In other words, Defendant ION Trading's RANorder link to the Commodity Futures Exchange disconnected frequently from December 26, 2013 to October 22, 2014, almost a full year. Simply mind-boggling.

94. Exhibit A2 shown in the "Comprehensive Exhibits" File Folder, is the lacuna, entitled "**Costliest Error due to RAN Link break on 1/2/2014 and 1/3/2014**". The contents of Exhibit A2 are quite explicit. Instead of successfully closing out his positions on 1/2/2014 with a profit of $10,000, or closing them out for a profit of $6,500 on 1/3/2014, Harry ended up losing $127,600 by 2/24/2014. Same Defendant ION Trading's RANorder disconnection convulsed into a horrendous nightmare, and a humongous loss. Trading is a mind game. Just a little hiccup can cause tremendous damage. Almost 50% of Harry's and Draper's Account was wiped out because of one simple act -- Defendant ION Trading's RANorder link break or disconnection on 1/2/2014 and 1/3/2014.

95. Exhibit A4, shown in the "Comprehensive Exhibits" File Folder, entitled

"**Email Correspondences of January 6 and 7, 2014**", is specific to the occurrences of 1/2/2014 and 1/3/2014.

96. Exhibit A5, shown in the "Comprehensive Exhibits" File Folder, entitled "**Unbelievable Occurrences and errors at about 12:00 midnight California time on 1/15/2014**", is probably a QST problem where the trading chart suddenly disappeared. Without the chart, it was difficult to trade. Another nightmare for Plaintiff and Harry. The contents of the document are quite lucid.

97. Exhibit A6, shown in the "Comprehensive Exhibits" File Folder, entitled "**Platform Problems of March 10, 2014**", is a QST Problem that also almost wiped out Plaintiff's and Harry's Account. In this case, Harry was not informed by the Technical Department of QST that the Pre-release version and the "Normal" version were different, when executing on the Commodity Futures Exchanges. The charts and data were all the same, no visible difference. Harry only knew there was a difference when the Trade Orders were not filled by Defendants and Harry's and Draper's Account was almost blown away.

98. Exhibit A7, shown in the "Comprehensive Exhibits" File Folder, entitled "**RAN Problem on May 16, 2014**", is another Defendant ION Trading's RANorder connection problem. The contents of the email exchange are quite explicit.

99. Exhibit A8-a, below and in the "Comprehensive Exhibits" File Folder, entitled "**Cannot place a Limit Order, only Market Order on May 16, 2014**", is the screenshot of the same Defendant ION Trading's RANorder problem in #89 above.

100. Exhibit A9, shown in the "Comprehensive Exhibits" File Folder, entitled "**Platform Problems of May 19, 2014**", is Defendant QST Problem. The contents are quite lucid.

101. Exhibit A10, shown in the "Comprehensive Exhibits" File Folder, entitled "**Problems with RAN on June 30, 2014**", is Defendant ION Trading's RANorder Problem. The email contents are very clear.



**Exhibit A8-a: Cannot place a Limit Order, only Market Order on May 16, 2014**

102. Exhibit A11-a shown below and in the "Comprehensive Exhibits" File Folder, entitled "**Cannot trade Soybean Spreads**", is a screenshot of Defendant ION Trading's RANorder Problem of #92 above on June 30, 2014. Plaintiff clicked his blue buy button at 5:47 p.m. on June 30, 2014 to place a buy order for 20 contracts of 2014 August/November Soybean Spread but Defendants could not fill the electronic order.

103: Exhibit A13, shown in the "Comprehensive Exhibits" File Folder, entitled "**Problems with RAN on the QST Platform** ", is Defendant ION Trading's RANorder Problem. The same problem of Defendant ION Trading's RANorder link disconnection between the QST Platform and the Commodity Futures Exchange, on October 3, 2014. Defendants once more failed to route and clear Plaintiff and Harry's Trade Order, and hence, Harry was unable to protect his naked 5 contracts of May 2014 Wheat (ZWZ14) contracts with 5 March 2015 Wheat (ZWH15) Contracts, to create a protective Spread. And this led to a significant loss. When it rains it pours. The same Defendant ION Trading's RANorder link disconnection problem.



**Exhibit A11-a: Cannot trade Soybean Spreads**

104. Exhibit A14, shown in the "Comprehensive Exhibits" File Folder, entitled **"Screenshots showing continuous disconnections on October 15, 2014"**, is Defendant QST and/or Defendant ION Trading's RANorder Problem. This Exhibit shows continuous breaks in Defendant ION Trading's RANorder link between the QST Platform and the Commodity Futures Exchange on October 15, 2014.

105. Exhibit A15, shown below and in the "Comprehensive Exhibits" File Folder, entitled **"RAN Problems of October 22, 2014"**, is the same Defendant ION Trading's RANorder Problem -- one more disconnection on October 22, 2014. (Exhibit A15 is the same as Exhibit A3).

## RAN Problems of October 22, 2014

Bogdan Sarandan

To

bharry88@yahoo.com

Oct 22, 2014

Hi.

We just contacted RAN and it seems that they have some connection issues.

Regards,

Bogdan Sarandan.

**From:** bharry88@yahoo.com

**Sent:** Wednesday, October 22, 2014 11:57

**Subject:** uploaded client logs (22/Oct/2014 03:56:00 -> 22/Oct/2014 03:57:00)

THe QST-RAN live link has been disconnected since 1:00 a.m California time and I cannot execute any trades. I called KCG in Chicago and spoke to one Tony at about 1:15 a.m. California time and he could not help me but said he will contact QST and call me back. I also called RAN in Chicago but no response. This is the same problematic mess in Novermber, December 2013 and January of 2014 that caused me to lose a lot of money . Would you please find out what the problem is and fix it before the morning session begins because I am now going to bed.

### Exhibit A15

106. Exhibit A3, shown in the "Comprehensive Exhibits" File Folder, entitled **"Trading Problems of October 22, 2014"**, is the screenshot of the same Defendant ION Trading's RANorder Problem in #69 above.

107. These are some of the horrendous trading nightmares, Plaintiff went through in the hands of Defendants in 2014. There are a lot more in 2014 but they cannot all be listed because that will amount to writing a book.

108. Part B3: 2015 follows next, with no abatement of the frequent, repeated patterns of Defendants' interconnection failures with their attendant execution failures, corroborating Plaintiff's and Harry's belief that Defendants were intentionally committing these violations to destroy Plaintiff's and Harry's Account, so as to benefit from their loss. For, this is a zero-sum game, where one person's loss is another person's gain. After all, Defendants were also

1  trading in the Commodity Futures Market. And the following are the violations of
2  Defendants in 2015.

3  **B3. Defendants' Fraudulent Misrepresentations Proven by the Consistent Pattern of**
   **Failure of their Electronic Trading Facility, Platforms and Computer Servers in 2015**
4

5        109. If the violations of Defendants were bad in 2013, worse and deadly in 2014,
6  they were simply WANTONLY RECKLESS and INSANELY MALICIOUS in 2015.
7  Defendants were like wild beasts of destruction, bent on putting the final nail on the coffin
8  of Plaintiff Draper's and Harry's Trading Account # TSMPF148, in 2015.

9        110. As of Friday, April 3, 2015, the Total Equity in Account # TSMPF148 was
10  $20,365. The amount had shrunken from the $25,000 Equity of January 1, 2015. Despite the
11  assurances of defendants to Harry that they (defendants) had fixed their execution problems,
12  which Harry believed, Harry still traded with extreme caution to ensure that he recouped all
13  the losses and then move to a more reliable Brokerage Firm. Harry was still hopeful that
14  Defendants especially QST and ION Trading had finally cleaned up their reckless and
15  malicious acts in the new year of January 1, 2015.

16        111. There were no major issues in early 2015 and Harry was getting used to the
17  new normal until April 2015, when Defendant ION Trading bared its destructive and deadly
18  fangs, once more.

19        112. Exhibit B1 in the "Comprehensive Exhibits" File Folder, entitled, **"System**
20  **Message for RAN Migration to its New ION Datacenter on 4-4-2015"**, shows Defendant
21  ION Trading informing Harry that ION Trading was migrating to a new Data Center starting
22  from the weekend of April 4, 2015 and those (including Plaintiff) using the QST Platform
23  do not need to change anything when logging in. In other words, all those using the QST
24  Platform to trade (including Plaintiff and Harry) had nothing to worry about, with regards to
25  the Data Center migration. Defendant QST also sent Harry an email about the same data
26  center migration. Thus Plaintiff and Harry did not concern themselves with ION's Data
27  Center transfer and went about their normal business.

28

113. With the assumption that Defendant ION Trading knew what it was doing and had multiple parallel Servers for redundancies, Plaintiff and Harry believed Defendant ION and hence, never anticipated what happened next.

114. Exhibit B2 in the "Comprehensive Exhibits" File Folder, entitled, "**Could not execute my trades on April 5, 2015 for the Monday Day Session of April 6, 2015**", shows that Defendants failed to fill the Trade Orders of Plaintiffs on 4/5/2015. Harry had 5 naked May 2015 Wheat (ZWK15) contracts and the candlestick signal on Sunday evening trading session of 4/5/2015 opened bearish. Exhibit B3 in the "Comprehensive Exhibits" File Folder,, entitled **"ZWN15 Chart for April 5 and 6, 2015"** attests to this fact. (Chart not attached, and can only be seen electronically).



**Exhibit B2: Could not execute my trades on April, 5 2015 for the Monday Day Session of April 6, 2015**

115. Plaintiff immediately placed an order to short-sell 5 contracts of July 2015 (ZWN15) wheat to counter the 5 naked May 2015 (ZWK15) wheat contracts to protect the Account until he was certain of the direction of the Wheat market. Unfortunately, Defendants failed once more to fill the Trader Order of Harry as shown by Exhibit B2.

Plaintiff's precarious Account was now unprotected because of Defendants' intentional or willful and malicious actions on Plaintiff's Trade Orders. How could Defendant ION's migration to another Data Center prevent Defendant's from routing and clearing Plaintiff's Trade orders? This was a new phenomenon and Plaintiff was totally dumbfounded, shocked and confused.

116. Plaintiff lost at least $5,000 as of April 6, 2015 because of these willful or intentional and wantonly malicious actions of Defendants, especially Defendant ION Trading, using its Computer Servers and Programs to defraud Plaintiff. It seems there was no respite for Harry from Defendants' atrocious actions to defraud Plaintiff.

117. Just trading stocks and options on Wall Street is a very difficult job. Trading Commodities in the Commodity Futures Market is even more difficult and extremely deadly. Thus, savvy Commodity Futures Traders trade Commodity Futures with extreme caution and with every possible protection. But no amount of caution, no amount of protective plans and measures, and no amount of Commodity Futures trading experience and savviness could have prepared any Commodity Futures Trader, especially Plaintiff, for the intentional or willful, manipulative and wantonly malicious actions of Defendants as described above. Defendants were bent on defrauding Plaintiff by any means possible, and they succeeded.

118. Plaintiff thought he had seen it all but the horror movie of Defendants' intentional or willful, wanton and extremely malicious actions to defraud Plaintiff was not over. Exhibit B4 shown in the "Comprehensive Exhibits" File Folder, entitled, **"Platform was disconnected at about 9:00 A.M., Friday, April 10, 2015, and hence could not trade** ", is a continuation of the horror movie, as Plaintiff encountered the same Defendant ION Trading's problems, just like on 4/5/2015 and 4/6/2015.

119. Exhibit B5 also shown in the "Comprehensive Exhibits" File Folder, entitled, **"Rejected Order for Friday, April 10, 2015"** is the screenshot of the item #118 above.

**Exhibit B6-a: Problem with execution on Sunday, April 12, 2015 for Monday, April 13, 2015 Trade**

120. Exhibit B6-a above and in the "Comprehensive Exhibits" File Folder, entitled, **"Problem with execution on Sunday, April 12, 2015 for Monday, April 13, 2015 Trade"**, is a continuation of the horror movie. Plaintiff again, encountered the same Defendant ION Trading problem --- Defendant ION Trading's migration to another Data Center causing Defendants to fail to fill Plaintiff's electronic trade orders.

121. Exhibit B7 shown in the "Comprehensive Exhibits" File Folder, entitled, **"Another Notice from RAN of its migration to the ION Server on April 24, 2015"**, was another notice of Data Migration sent by Defendant ION Trading to Plaintiff, who no longer knew what to expect in the scenarios of Defendants' trading horror movie of deceit, and willful and egregiously malicious actions to defraud Plaintiff.

122. Exhibit B8-a, below and in the "Comprehensive Exhibits" File Folder, **"One more Error from QST/RAN on April 28, 2015"**, is a continuation of the horror movie and the finale of Defendant ION Trading's intentional or willful and wantonly malicious acts of

1    using its Electronic Trading Computer Servers and Programs to defraud Plaintiff. This was
2    the last straw that broke the camel's back. Defendant ION Trading's deadly migration to
3    another Data Center now forced Plaintiff to close out all his trading positions or get wiped
4    out totally. It seems the horror movie had finally come to an end. Unfortunately, it was not a
5    horror movie. It was real and Defendants had intentionally defrauded Plaintiff wantonly,
6    willfully and maliciously using their Electronic Trading Programs, Computer Servers and
7    Electronic Trading Facility, in combination with their manipulative Scheme.



**Exhibit B8-a: One more Error from QST/RAN on April 28, 2015**

22    123. Plaintiff thus closed out all his open trading positions in the Commodity Futures
23   Market on April 28, 2015 to save the remaining $6,621.49, so as not to be totally wiped out
24   by Defendants, especially ION Trading. Plaintiff thought all this was a dream but it wasn't.
25   Defendants, especially ION Trading had put the final nail on Plaintiff's Account coffin,
26   destroying the Account from $275,000 on November 14, 2013 to a mere $6,621.49 on April
27   28, 2015. Wow!!! Plaintiff is still wondering if this
28   is a dream or for real. Defendants' Manipulative Fraud is Simply mind-numbing.

124. What is really shocking is that in this 21st Century of Parallel Servers with multiple redundancies, Defendant ION Trading would repeat the same problems from April 5, 2015 to April 28, 2015, jeopardizing its Wall Street Clients Accounts, especially in a very fast-moving and dynamically deadly Commodity Futures Market.

125. After the first Data transfer problems, why did Defendant ION Trading not leave the data of its clients on the old Servers, while moving duplicates of the data to the new Servers or new Data Center? Does it mean Defendant ION Trading did not have duplicates of its Client's data? Simply befuddling that such can occur in this 21st Century of very Advanced Technologies, especially in computing. And with so much of its Client's money on the line, Defendants, especially ION Trading did not take any precautionary measures. This is either wantonly malicious recklessness or egregiously willful manipulative fraud.

126. Once is an accident, twice is a careless mistake and thrice is intentional. More than thrice is malicious willfulness or callous intentionality. If a person rams his car on his neighbor's door, once, it could be an accident, twice an honest mistake but 30 times, is malicious intentionality or callous willfulness. Defendants repeatedly manipulated the execution of Plaintiff's Electronic Commodity Futures Trade Orders more than 50 times, and with ruthlessness, within the first five months of Account Opening. This is a well calculated, well-planned, efficiently executed, malicious and manipulative Commodity Futures Fraud, Defendants perpetrated against Plaintiff. The table below (Table 3) shows Defendants' most egregious infractions and corresponding direct damages and costs from November 15, 2013 to April 28, 2015. The Direct Damage Cost is $287,462.50. As of December 31, 2016, the Direct and Consequential Damage Costs due to Defendants' Manipulative Frauds $45 million. In other words, the Economic Injury-In-Fact to Plaintiff as a result of Defendants' Manipulative Frauds, is $45 million as of December 31, 2016. This amount will continue growing until the Case is finally resolved, because of continuing loss of opportunities.

## Actual Documented Direct Damage Costs from Infractions  (Table 3)

| Occurrence Date | References | Description of Defendants' Violations causing the Damage to Plaintiff | Damage Cost |
|---|---|---|---|
| 11/15/2013 | Exhibits 1, 5a-1 | Defendants' Failure to Execute 20 Contracts of July/November 2014 Soybean Spread | $146,000.00 |
| 11/15/2013 | Exhibits 1, 5b-1 | Defendants' Failure to Execute 20 Contracts of July/November 2014 Soybean Spread | $91,200.00 |
| 11/17/2013 | | Defendants' Failure to Execute 20 Contracts of February/June 2014 Crude Oil Spread | ** |
| 11/21/2013 | Exhibit 3 | Defendants' Failure to Execute 20 Contracts of January/July 2014 Soybean Spread | $24,500.00 |
| 12/26/2013 | Exhibit 4 | Defendants' Failure to Execute 20 Contracts of Mar'14 and later Jan'14 Soybean | ** |
| 11/15/13 to 12/26/13 | | Defendants Disconnection Problems and Failure to execute Plaintiff Trade Orders, 11/15/13 - 12/26/13, were too many to even fathom. And the cost is incalculable. | ** |
| 1/2/2014 | Exhibits A1-a, A1-b, A2 | Defendants' Failure to Execute 20 Contracts of February 2014 Cattle/Hog Spread | $10,000.00 |
| 2/24/2014 | Exhibits A1-a, A1-b, A2 | Plaintiff lost $124,600.00 in the Feb'14 Cattle/Hog Spreads of 1/2/2014 above | ** |
| 3/10/2014 | Exhibit A6 | QST Platform Software bugs while Account TSMPF148 was in a $97,000 hole | ** |
| 5/16/2014 | Exhibit A8 | Defendants' Failure to Execute 20 Contracts of June/December 2014 Copper Spread | ** |
| 5/19/2014 | Exhibit A9 | Network interconnection Failure and hence Plaintiff could not trade | ** |
| 6/30/2014 | Exhibit 10 | API Software Bugs and hence Plaintiff could not trade the Soy Complex | ** |
| 7/28/2014 | Exhibit A12 | Respondent's Failure to supervise and forced liquidation of Aug/Nov'14 Soybean Spread | $2,437.50 |
| 10/3/2014 | Exhibit A13 | Defendants' Failure to Execute 5 Contracts of March 2015 Wheat | ** |
| 10/22/2014 | Exhibit A3 or A15 | Defendants' Failure to Execute 5 Contracts of March 2015 Wheat | ** |
| 4/5/2015 | Exhibits B2 and B3 | Defendants' Failure to Execute 5 July 2015 Wheat Contracts | $3,825.00 |
| 4/6/2015 | Exhibits B2 and B3 | Defendants' Failure to Execute 5 July 2015 Wheat Contracts | $7,000.00 |
| 4/10/2015 | Exhibit B4 and B5 | Defendants' Failure to Execute 3 July 2015 Wheat Contracts | ** |
| 4/12 -13/15 | Exhibit B6 | Defendants' Failure to Execute 3 July 2015 Wheat Contracts | ** |
| 4/28/2015 | Exhibit B8 | Defendants' Unauthorized Trade of 1 July 2015 Wheat Contract | $2,500.00 |
| ** Defendants' documented offenses that are difficult to give concrete figures for now, but exceed $100,000 in direct losses | | | |
| **Total** | | | $287,462.50 |

## C. BREACH OF FIDUCIARY DUTY UNDER CALIFORNIA LAW

127. Plaintiff re-alleges and incorporates each preceding and succeeding paragraph of the allegations with the same force and effect as if fully restated herein.

128. Defendants KCG, Wedbush, MST, QST and ION, and their Officers, Employees and Agents, including Coleman, E. W. Wedbush, Flynn, Sturm, Benz Pignataro and Sylverne, owed a Fiduciary Duty to Plaintiff to seek to obtain the best execution of Plaintiff's electronic commodity futures trade Orders, as directed by Plaintiff, in his non-discretionary Trading Account #TSMPF148. For, they are all Participants in their common enterprise, KCG's and Wedbush's Electronic Trading Facility that routes and Clears Plaintiff's Electronic Trade Orders.

129. The following is the last sentence in the Daily and Monthly Account Statements KCG sent Plaintiff during the relevant period.

> "KCG Futures will not render, or be responsible for the rendering of, trading advice; any of the research recommendations made by an Introducing Broker are those of the Introducing Broker; and **KCG Futures acts only as the entity through which trades are executed or cleared."**

130. And the following is the last sentence in the Daily and Monthly Account Statements Wedbush sent Plaintiff during the relevant period.

> "Wedbush will not render, or be responsible for the rendering of, trading advice; any of the research recommendations made by an Introducing Broker are those of the Introducing Broker; and **Wedbush acts only as the entity through which trades are executed or cleared.**

131. As explicitly stated in Paragraphs 129 and 130 above, KCG or Wedbush **acts only as the entity through which trades are executed or cleared,** on behalf of Plaintiff. Unfortunately, KCG and Wedbush as Clearing FCMs, breached their Fiduciary Duty to Plaintiff by failing woefully to execute or clear Plaintiff's electronic trade orders in a timely manner or at all, causing Plaintiff a staggering amount of financial Injury-In-Fact.

132. Furthermore as a Fiduciaries responsible for executing or clearing Plaintiff's electronic trade orders, KCG and Wedbush had a duty during the relevant period, to disclose all relevant facts about their electronic trading Facility, their businesses, operations , risk

1    profiles, affiliates and previous litigations against them, especially with regards to violation

2    of the CEA. .All the said Defendants, especially the Clearing FCM-Defendants breached

3    their duties to Plaintiff by failing to Disclose and Misrepresenting material facts, as clearly

4    described throughout the paragraphs of this Complaint. Defendants' breach of Fiduciary

5    Duties were very costly to Plaintiff.

## D. CLEARING FCM-DEFENDANTS, KCG'S AND WEDBUSH'S BREACH OF CONTRACT UNDER CALIFORNIA LAW

8       133. Plaintiff re-alleges and incorporates each preceding and succeeding paragraph

9    of the allegations with the same force and effect as if fully restated herein

10       134. In the Futures Customers Agreement, Exhibits xix-a and xix-b, the following

11    statements are lucidly spelled out,

> "In consideration of the Agreement of KCG Americas LLC to act as broker for the signatory on page 2 hereof (customer) in the purchase or sale of futures (which terms shall include contracts relating to immediate or future delivery of commodities, forward and cash contracts and options on futures) Customer agrees, in respect to all futures accounts which Customer has or may at any future time have with broker, or its successors, including accounts from time to time closed and reopened,"

16       135. The above excerpt from the Agreement signed by Draper on behalf of Plaintiff

17    Harry and Draper is very explicit, stating that Clearing FCM-Defendant KCG and later

18    Clearing FCM-Plaintiff Wedbush, would act as Broker for Plaintiff and Draper in the

19    purchase or sale of futures.

20       136. Plaintiff Harry and Draper met all their aspects of the Agreement with Clearing

21    FCM-Defendants by opening their Trading Account with MST/KCG, depositing their initial

22    $275,000, setting up the QST Platform, the Front End of Clearing FCM-Defendants'

23    Electronic Trading Facility, and then properly clicking the "buy" or "sell" button to trade

24    electronically.

25       137. As proven without a scintilla of doubt, throughout all the preceding and

26    succeeding paragraphs of the allegations in this Complaint, and backed by irrefutable

27    evidentiary facts in the accompanying Exhibits, Defendants, especially the Clearing FCM-

28    Defendants were ruthlessly willful, unconscionably malicious or wantonly reckless in their

1 | purchase and sale of Commodity Futures for Plaintiff, whenever he placed his electronic
2 | trade orders. In other words, Defendants, especially the Clearing FCM-Defendants failed
3 | woefully to fill Plaintiff's Commodity Futures Trade Orders or fill them in a timely manner,
4 | whenever Plaintiff Harry clicked the appropriate "buy" or "sell" button; an egregious breach
5 | of their contractual Agreement with Plaintiff Harry and Draper.

6 | 138. Furthermore, Plaintiff Harry had a contractual agreement with Defendant
7 | Computer Voice Systems, Inc ("QST"), for QST to provide their QST Platform, the Front
8 | End of FCM-Defendants KCG's and Wedbush's Commodity Futures Electronic Trading
9 | Facility, to Harry for Trading Electronically and for a fee of $299.95 per month.

10 | 139. As part of this Agreement, the Technical Department of Defendant-QST taught
11 | Plaintiff Harry how to use the QST Platform to place Electronic Trade Orders , and how to
12 | set up the Depth of Market ("DOM") to easily click the "left blue button" to "buy' or the
13 | "right red button" to "sell" Commodity Futures electronically.

14 | 140. Plaintiff Harry met all that was required of him for the QST Trading Platform
15 | Agreement with Defendant-QST, by learning to use the Platform properly, setting up the
16 | DOM correctly, and then testing the QST Demo Platform for about three months, to ensure
17 | that Plaintiff can easily place his Commodity Futures Trade Orders electronically through
18 | the Exchanges, and that Defendants' Electronic Commodity Futures Trading Facility was
19 | functioning properly. The QST-Demo Platform was flawless, as was Defendants' electronic
20 | routing and fulfillment of Harry' Electronic Trade Orders through the "Virtual Exchanges".

21 | 141. It was only when Plaintiff went from the QST Demo Platform to the QST Live
22 | Platform to trade electronically, in the "Real Commodity Futures Exchanges" like CME,
23 | CBOT and ICE, instead of the "Virtual Ones" that Plaintiff's trading nightmares with
24 | Defendants began, starting from November 15, 2013.

25 | 142. As required of him in the Customer Futures Agreement with the FCM-
26 | Defendants, and the Platform Agreement with Defendant QST, Harry clicked the "left blue
27 | button" to "buy' or the "right red button" to "sell" Futures electronically, and either nothing
28 |

1  happened or Plaintiffs electronic Trade Orders were not filled in time by Defendants, in the
2  lightning-fast and dynamic Electronic Commodity Futures Market.

3       143. Defendants breached their contractual Agreement with Plaintiff Harry and
4  Draper by failing to route and fill Harry's electronic Trade Orders or failing to fill them in a
5  timely manner, whenever Plaintiff clicked the "left blue button" to "buy' or the "right red
6  button" to "sell" Commodity Futures electronically.

7       144. As a direct and proximate result of FCM-Defendants KCG's and Wedbush's,
8  breach of the Customer Futures Agreement and QST's breach of the Platform Agreement,
9  Plaintiff Harry sustained Injury-In-Fact, including direct and consequential financial losses

10  **E.  AIDING AND ABETTING FRAUD**

11       145. Plaintiff re-alleges and incorporates each preceding and succeeding paragraph
12  of the allegations with the same force and effect as if fully restated herein.

13       146. Clearing FCM-Defendants KCG and Wedbush, Coleman, E. Wedbush, Gilmore
14  and Hostetler owed duties to Plaintiff Harry and Draper, to truthfully and accurately
15  communicate to Harry and Draper, and to disclose all pertinent information about KCG and
16  Wedbush, especially their businesses, operations, risk profiles, and affiliates, that would be
17  material to Plaintiff Harry's and Draper's decision to entrust their funds to and otherwise do
18  business with KCG and Wedbush and that is otherwise necessary for full and fair disclosure.
19  The aforementioned Defendants breached their obligations to Plaintiff and Draper by
20  deceiving, misrepresenting, lying and materially concealing numerous facts and information
21  about KCG and Wedbush, their businesses and operations, risk profiles and affiliates. By so
22  doing, these Defendants committed fraud, deceit and misrepresentations towards Plaintiff
23  and Draper.

24       147. MST, Flynn, QST, Sturm, Benz, ION, Pignataro and Sylverne aided and
25  abetted, encouraged and rendered substantial assistance to the said FCM-Defendants to
26  accomplish the fraud and wrongful acts complained of herein. In aiding and abetting and
27  substantially assisting the commission of the acts complained of, MST, Flynn, QST, Sturm,
28  Benz, ION, Pignataro and Sylverne acted with awareness of the Clearing FCM-Defendants,

1  KCG's and Wedbush's, and Coleman's, E. Wedbush's, Gilmore's and Hostetler's Unlawful

2  Acts and realized that their conducts would substantially assist the accomplishment of the

3  Unlawful Acts and scheme alleged herein, including but not limited to the following:

## DEFENDANTS' FRAUDULENT FAILURE TO SUPERVISE

5       148. Plaintiff re-alleges and incorporates each preceding and succeeding paragraph

6  of the allegations with the same force and effect as if fully restated herein.

7       149. There are two aspects to Defendants' Fraudulent Failure to Supervise, namely,

8  (1) Defendant's Intentional or Egregiously Reckless Failure to Supervise Agents and

9  Employees in violation of **NFA Rule 2.9(a)** which states as follows:

10     "Each Member shall diligently supervise its employees and agents in the conduct of
       their commodity futures activities for or on behalf of the Member. Each Associate who
11     has supervisory duties shall diligently exercise such duties in the conduct of that
12     Associate's commodity futures activities on behalf of the Member."

13  and (2) Enterprise-wide or Electronic Trading Facility-wide Failure to Supervise, in

14  violation of **NFA Interpretive Notice 9046 to Rule 2.9 (Supervision of the Use of**

15  **Automated Order-Routing Systems (AORS))**, parts of which state as follows:

16     "This Interpretive Notice applies to AORSs that are within a Member's control,
       including AORSs that are provided to the Member by an application service provider
17     or an independent software vendor. While a Member is not, of course, responsible for
       an AORS chosen by the customer and outside of the Member's control - such as direct
18     access systems provided by exchanges - the Member is nevertheless responsible for
19     adopting procedures reasonably expected to address the trading, clearing, and other
       risks attendant to its customer relationship."
20
       **Capacity**
21     "General Standard. Members who accept orders must adopt and enforce written

22     procedures reasonably designed to maintain adequate personnel and facilities for the
       timely and efficient delivery of customer orders and reporting of executions. The
23     procedures must also be reasonably designed to handle customer complaints about
       order delivery and reporting in a timely manner.
24     Members may not misrepresent the services they provide or the quality of those
25     services. If a Member represents that it maintains a particular capacity or performance
       level, it must take the measures necessary to achieve that level."
26
27     "Disaster Recovery and Redundancies. The Member should have contingency plans
       reasonably designed to service customers if either the system goes down or activity
28     exceeds reasonably expected peak volume needs. The Member should use redundant

systems or be able to quickly convert to other systems if the need arises. These backup systems can include facilities for accepting orders by telephone or reliance on third-party brokers or clearing firms."

### 1) *FAILURE TO SUPERVISE EMPLOYEES AND AGENT*

150. Exhibit A12, shown in the "Comprehensive Exhibits" File Folder, entitled **"Problems with KCG on July 28, 2014"**, is Defendants KCG and MST Problem. This is a really bizarre problem from Defendants KCG and MST. Very early in the morning (California time) of Monday, July 28, 2014, Patrick Flynn of MST called Harry on the phone and demanded he immediately get out of all his positions in the August/November 2014 Soybean Spread. Harry was shocked and asked Flynn why. Flynn told Harry that Defendant KCG sent him an email he forwarded to Harry and he was following up the email with the call. Flynn emphatically repeated that Harry must close out his Soybean Spread positions immediately. Harry obliged, and made a profit of $2,000 on 7/28/2014 instead of a profit of $4,437.50 or more on 7/30/3014.

151. After closing out our trading positions, Harry was very furious and fired an email to Gail Winkers of KCG who started the process of Harry being prematurely forced out of the market. It appears Gail Winkers of KCG and Patrick Flynn of MST had no clue what they were doing and forced Harry out of the market on a whim, costing Plaintiff and Harry at least $2,437.50. Exhibit A12 mentioned above, describes these actions very lucidly. It seems head or tail Plaintiff and Harry lose because of Defendants' Fraud.

152. Gail Winkers who was the Assistant Vice President of Customer Service at KCG at the time, ignored Harry's email (Exhibit A12) and no one at KCG cared to respond to Harry's question, till date. Just outright silence from KCG.

153. The Managers or Supervisors of Barry Corbett, Jamie Leibfried and Gail Winkers of Defendant KCG failed to supervise these aforementioned Individuals, and did not even care to give any explanation to Harry as to why this violation occurred, and thus, Defendants violated **NFA Rule 2.9(a),** to continue to defraud Plaintiff and Harry.

## 2) *RESPNDENTS' COMMON ENTERPRISE-WIDE OR ELECTRONIC TRADING FACILITY-WIDE SUPERVISORY FAILURE*

154. As succinctly described throughout all the preceding and succeeding paragraphs of the allegations, Defendants repeatedly failed to route and clear Plaintiff's Electronic Commodity Futures Trade Orders due mostly to the repeated pattern of interconnectivity failures of Defendants' disparate Electronic Trading Subsystems, networked into its Electronic Trading Facility.

155. Under **NFA Interpretive Notice 9046 to Rule 2.9 (Supervision of the Use of Automated Order-Routing Systems (AORS)),** Defendants, especially FCM-Defendants KCG and Wedbush who are NFA-registered Members had a duty to "adopt and enforce written procedures reasonably designed to maintain adequate personnel and facilities for the timely and efficient delivery of customer orders and reporting of executions", and "may not misrepresent the services they provide or the quality of those services". Furthermore, as Members, KCG and Wedbush "should have contingency plans reasonably designed to service customers if either the system goes down or activity exceeds reasonably expected peak volume needs" and KCG and Wedbush "should use redundant systems or be able to quickly convert to other systems if the need arises."

156. The frequency and numerosity of the repeated interconnectivity failures of Defendants, with the subsequent repeated failures of Defendants, especially the FCM-Defendants, KCG and Wedbush, to fill Plaintiff's Trade Orders in a timely manner or even at all, coupled with their inability to take any reasonable steps to correct such repeated failures from November 15, 2013 to April 28, 2015, is an indication of enterprise-wide failure of FCM-Defendants, KCG and WedBush, to supervise their employees, agents and associated persons. This egregious Supervisory Failure of Defendants was extremely detrimental to Plaintiff, and a violation of **NFA Rule 2.9.**

### F.  **FINANCIAL ELDER ABUSE**

157. Plaintiff re-alleges and incorporates each preceding and succeeding paragraph of the allegations with the same force and effect as if fully restated herein.

158. Draper was born in 1946. During all times of Defendants' wrongful acts alleged herein, Draper was over 65 years. He is, and at all times has been an elder as defined by California Welfare and Institutions Code Section 15610.2

159. Draper is currently 71 years old and he was over 65 years old when he signed the Customer Future Agreement with the Clearing FCM, KCG on November 6, 2013, as shown on page 3 of the Agreement and also on page 1, where Draper stated his date of birth as 12/26/1946. Thus, Flynn, MST, KCG, Coleman, Gilmore, and Hostetler were aware of that Draper was an elderly person, when they committed Fraudulent Misrepresentation, Fraudulent Concealment and other illegal acts on Draper.

160. When Wedbush bought the Futures Division of KCG on December 1, 2014, and converted it into Wedbush Futures, it took over Draper's Futures Agreement. Hence, Flynn, MST, Wedbush, Edward Wedbush, Gilmore, and Hostetler also knew that Draper was an elderly person, when they committed Fraudulent Misrepresentation, Fraudulent Conceal-ment and other illegal acts on Draper, at Wedbush.

161. ION, Andrea Pignataro, Robert Sylverne, QST, Paul Sturm and Scott William Benz participated in the Financial Abuse of the Elderly Draper by aiding and abetting the commission of the Fraudulent Misrepresentation, Fraudulent Concealment and other illegal acts on Draper.

# X. CAUSES OF ACTION

## FIRST CAUSE OF ACTION (<u>FRAUDULENT CONCEALMENT</u>)

**A1-1. Fraudulent Concealment (Based on FRCP 9(b)) by Clearing FCM-Defendant KCG, its officers, agents, employees, and introducing broker, MST and its president, Flynn, before opening the Commodity Futures Trading Account #TSMPF148**

162. Plaintiff re-alleges and incorporates each preceding and succeeding paragraph of the allegations with the same force and effect as if fully restated herein.

163. Patrick Joseph Flynn, President of MST, and Daniel B. Coleman (CEO of KCG), Carl Gilmore,(Head of KCG Futures), and Greg Hostetler (Chief Compliance Officer of KCG Futures) intentionally concealed from Plaintiff Draper and Harry that KCG was on the verge of bankruptcy because of its massive electronic operational failure on August 1,

2012. These Defendants also knowingly concealed from Harry and Draper the numerous lawsuits against KCG following its melt-down on August 1, 2012, or acted with reckless disregard for the truth, and denied Plaintiff Harry and Draper these information that are highly relevant to Harry and Draper in their decision to open a Commodity Futures Trading Account with KCG.

164. Furthermore, the only contact Harry, the sole Trader of our Account, had with the Clearing FCM-Defendants KCG and Wedbush, and also with ION was through Flynn of MST, the Introducing Broker. Defendants KCG, Wedbush and ION did not allow Harry to have direct contact with them. Hence, Harry communicated with them only through Flynn but Harry had direct contact with QST, especially its Software Engineers and Benz.

165. Flynn, Harry's contact point for KCG, Wedbush and ION, intentionally and knowingly concealed from Harry all information about KCG, Wedbush and ION, as shown in the excerpts and email below, from October/November 2013 till present:

### Confusion of Names in Customer Futures Agreement

Email Heading: Przybylski, Belinda

From: Knight Futures <trade@pensonfutures.com>
Sent: Wednesday, November 06, 2013 2:05 P.M.
To: +KF FUTURES Trade
Subject: Main Street Trading IB Account Application

PDF Page 3 of the Agreement shows a headline of "efutures.com", and begins with the following sentence:

Thank you for choosing efutures.com, a trade name used by the Knight Futures division of Knight Capital Americas LLC, as your brokerage firm, and then, PDF Page10 of the Agreement shows "KCG"

### Flynn's Response to Harry's Request for Information about Defendants on 05/04/2015

Pat Flynn <pflynn@msttrading.com>
Mon 5/4/2015, 12:04 PMYou

Mr. Harry,

I will do my best to get you the contact information you requested as soon as possible, especially in regards to RAN.

Main Street Trading = Me
Wedbush = Greg Hostetler 608 348 5980

Regards,

Patrick Flynn

Patrick Flynn
Senior Account Executive
Main Street Trading
25391 Commercentre Dr. Suite 100
Lake Forest, Ca. 92630
(800)748-5083 ext. 7450
Fax (949)707-2725
pflynn@msttrading.com
www.msttrading.com

166. The Customer Futures Agreement excerpts above show five names, Knight Futures, Penson futures, efutures.com, Knight Capital Americas LLC and KCG. This was confusion galore as Harry could not tell what Company exactly he was dealing with and Flynn was not forthcoming or truthful. This was intentional by MST, Flynn and KCG to conceal any information about KCG and its Officers, Employees, Agents and Affiliates. With all these confusing names and Flynn intentionally and knowingly concealing information about Defendants, especially KCG and its other "parts", Harry would not have been able to find out about the near collapse of KCG or Knights Capital LLC on August 1, 2012 or even the numerous financial malfeasances of KCG et al., and all the litigations against them (KCG et al).

167. As shown in the above email of May 4, 2015, from Flynn to Harry, Flynn was concealing information about Wedbush, ION (RAN) and even himself. Instead of stating that he was the President of Main Street Trading, he stated that Main Street Trading = Me. He further gave information about Wedbush as Wedbush = Greg Hostetler 608 348 5980, while concealing the official position of Greg Hostetler. That is the level of deceit, lies and concealment of Flynn, the contact point of Harry to Defendants KCG, Wedbush and ION.

168. The following are Statements KCG filed on its Form 8-K with SEC on August 9, 2013.

## KCG Holdings, Inc. Form 8-K Filing with SEC on August 9, 2013

"KCG has employed significant effort to develop, implement and maintain reasonable business continuity plans, KCG will not be able to guarantee its systems will properly or fully recover after a significant business disruption in a timely fashion. If KCG is prevented from using any of its current trading operations or any third party services, or if its business continuity operations do not work effectively, KCG may not have complete business continuity. This could have a material adverse effect on KCG's business, financial condition and operating results.

*KCG could experience additional losses and liabilities as a result of the technology issue that arose and impacted Knight on August 1, 2012, and the events of August 1, 2012 could cause customers and counterparties to lose confidence in KCG's systems and adversely affect KCG's reputation, results of operations and ability to attract and maintain its business, and may also result in lawsuits, regulatory investigations and other burdensome costs for KCG*

Knight experienced a technology issue at the opening of trading at the NYSE on August 1, 2012. This issue was related to its installation of trading software and resulted in Knight's broker dealer subsidiary, Knight Capital Americas LLC, sending numerous erroneous orders in NYSE-listed and NYSE Arca securities into the market. Although this software was subsequently removed from Knight's systems and the software issue was limited to the routing of certain NYSE-listed stocks, it resulted in Knight realizing a pre-tax loss of approximately $457.6 million. This severely impacted Knight's capital base and business operations, and Knight experienced reduced order flow, liquidity pressures and harm to customer and counterparty confidence................................"

"Additionally, if existing or potential future clients and/or counterparties do not believe that KCG has addressed the technology issues related to the events of August 1, 2012, or if they have concerns about future technology issues, this could cause existing or future customers of KCG to lose confidence in KCG's systems and could adversely affect its reputation and its ability to attract or maintain customers and counterparty relationships................................"

"......................................... Knight's review covered a number of areas, including change management controls, market access controls, software development and implementation. The review is ongoing, however certain measures have been taken to address suggestions stemming from its review – which include, enhancing change management controls and implementing additional market access controls. Since August 1, 2012, Knight took several measures designed to enhance its processes and controls, which have been adopted by KCG, including: appointing a Chief Risk Officer; establishing a formal Risk Committee of its Board; implementing change

management controls, which require at different stages an additional layer of review and supervisory approval for significant software installations; adding market access controls designed to more closely monitor outbound routers and enable the rapid automatic shut-down of the routers; and deploying various kill switches for specific applications and...................".

169. The following statement of KCG in paragraph 184 above, sums up the core reason why KCG, Coleman, Gilmore, Hostetler, and MST and Flynn concealed the material facts from Plaintiff:

"Additionally, if existing or potential future clients and/or counterparties do not believe that KCG has addressed the technology issues related to the events of August 1, 2012, or if they have concerns about future technology issues, this could cause existing or future customers of KCG to lose confidence in KCG's systems and could adversely affect its reputation and its ability to attract or maintain customers and counterparty relationships..............................."

Said Defendants knew that if thy had made these material facts known to Plaintiff and Harry, Draper and Harry would never have opened a Futures Trading Account with KCG,

170. As NFA-registrants and/or controlling officers of NFA-registered entities, the aforementioned Defendants had a legal duty to disclose to Harry and Draper, the electronic operational failure of KCG on Aug. 1, 2012, KCG's financial malfeasances and litigations against KCG, in accordance with NFA Rule 2-26.

171. Harry and Draper relied upon the aforementioned Defendant's Deception, unaware of KCG's massive operational failure on August 1, 2012, its near bankruptcy and the numerous litigations against KCG. Had Plaintiff and Draper known of these facts, Harry and Draper would never have opened a Commodity Futures Trading Account to do business with KCG.

172. Owing to the concealment of the material facts, Plaintiff has sustained Financial Losses and Harry has sustained Injury-In-Fact Direct and Consequential Damages, and both Draper and Harry continue to suffer. Thus, the aforementioned Defendants are liable to Plaintiff for his Financial Losses in an amount to be proven at trial.

**A1-2. Fraudulent Concealment (Based on California Law) by Clearing FCM-Defendant KCG, its officers, agents, employees, and introducing broker, MST and its president, Flynn, before opening the Commodity Futures Trading Account #TSMPF148**

173. Plaintiff re-alleges and incorporates each preceding and succeeding paragraph of the allegations with the same force and effect as if fully restated herein.

174. Under California Law, Plaintiff has to establish a Defendant's fraud by concealment or fraudulent concealment, by proving the following five elements

"(1) the defendant must have concealed or suppressed a material fact,

(2) the defendant must have been under a duty to disclose the fact to the plaintiff,

(3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff,

(4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and

(5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage."

*Boschma v. Home Loan Center, Inc.* (2011) 198 Cal.App.4th 230, 248; see also *Mosier v. Southern California Physicians Ins. Exchange* (1995) 63 Cal.App.4th 1022, 1045.)1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ~ 26,943 at 44,557-67, (Jan. 14, 1997).

175. Defendants Flynn, MST, KCG, Coleman, Gilmore, and Hostetler are liable for intentionally concealing from Plaintiff, KCG's business, operations, risk profiles, affiliates, and litigations against it, that were material to Harry's and Draper's decision to open an Account with and do business with KCG.

176. Defendant Flynn, as President of MST, and Defendants Coleman as CEO of KCG, and Gilmore, and Hostetler, as Top Officers of KCG Futures, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers of their respective Companies and/or Divisions, each of these Defendants was able to and did control directly or indirectly what materials and information are sent to their Customers, including Plaintiff, before opening their Customers' Trading Account. These Defendants had direct involvement in the daily businesses of their respective Companies and participated in the concealment of the information to Plaintiff that was material to Plaintiff and Draper opening a Trading Account with Defendants.

177. By California Statutes and NFA Rule 2-26, Defendants had a legal duty to disclose to Plaintiff, Clearing-FCM KCG's business, operations, risk profiles, financial situation, affiliates and litigations against KCG, before opening the Futures Trading Account at KCG for Harry and Draper.

178. These Defendants knew they were concealing these information from Plaintiff because despite requests from them (Defendants) by Plaintiff for details about KCG, all Plaintiff got from Defendants, especially Defendant Flynn was either silence or lies and obfuscation. The intent of Defendants was simply to defraud Plaintiff.

179. With the plethora of Companies namely, Knight Futures, Penson futures, efutures.com, Knight Capital Americas LLC and KCG, Plaintiff had no clue what Company to deal with or what company he was dealing with, and Flynn of MST was not forthcoming. It was thus next to impossible for Plaintiff and Draper to have found out about the near collapse of Knights Capital Americas LLC on August 1, 2012. Had Harry and Draper been aware of just this fact alone, Harry and Draper would never have opened a Trading Account with KCG in November 2013.

180. Because of the concealment of these material facts by said Defendants, Plaintiff suffered and is still suffering from the Injury-In-Fact direct and consequential damages of Defendants' Misconducts, and the amount of damages will be proven during trial.

**A2-1. Fraudulent Concealment (Based on FRCP 9(b)) by Clearing FCM-Defendant Wedbush, its officers, employees, agents, and Introducing Broker, MST and its President, Flynn, before transferring the Commodity Futures Trading Account #TSMPF148 From KCG to Wedbush, to defraud Plaintiff.**

181. Plaintiff re-alleges and incorporates each preceding and succeeding paragraph of the allegations with the same force and effect as if fully restated herein.

182. Patrick Joseph Flynn, President of MST, and Edward W. Wedbush (CEO of Wedbush), Carl Gilmore (Head of Wedbush Futures), and Greg Hostetler (Chief Compliance Officer of Wedbush Futures) intentionally concealed from Plaintiff Harry and Draper information about Wedbush's business, operations, risk profiles and affiliates before transferring Harry's and Draper's Account #TSMPF148 from KCG Futures to Wedbush

Futures on December 1, 2014. These Defendants also knowingly concealed from Harry and Draper the numerous lawsuits against Wedbush as a Broker Dealer, Clearing FCM and Market Maker, or acted with reckless disregard for the truth, and thus denied Plaintiff Harry and Draper these information that are highly material to Harry and Draper in their decision to allow the transfer of their Commodity Futures Trading Account from KCG Futures to Wedbush Futures, to do business with Wedbush.

183. As NFA-registrants and/or controlling officers of NFA-registered entities, the aforementioned Defendants had a legal duty to disclose to Harry and Draper, information about Wedbush's business, operations, risk profiles and affiliates before transferring Harry's and Draper's Account #TSMPF148 from KCG Futures to Wedbush Futures on December 1, 2014, pursuant to NFA Rule 2-26.

184. Harry and Draper relied upon the aforementioned Defendant's Deception, unaware of the plethora of Wedbush's Unlawful Acts in violation of Federal Laws including the CEA, and the numerous litigations against Wedbush. Had Plaintiff and Draper known of these facts, Harry and Draper would never have allowed the transfer of their Trading Account from KCG to Wedbush, to do business with Wedbush.

185. Owing to the concealment of these material facts, Plaintiff has sustained Injury-In-Fact Direct and Consequential Damages, and continues to suffer. Thus, the aforementioned Defendants are liable to Plaintiff for Injury-In-Fact damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION (DEFENDANTS' FRAUDULENT MISREPRESENTATIONS)

**B1. Defendants' Violations of 7 U.S.C. § 6b: Fraudulent Misrepresentations - Defendants' representations to Plaintiff Harry that their very tightly-integrated Electronic Trading Facility would handle Harry's Electronic Trade Orders with seamless flow was inaccurate and in sharp contrast to the Defendants' consistent Pattern of Failure to Seek to Obtain the Best Execution of Plaintiff's Electronic Commodity Futures Trade Orders for 17 Consecutive Months.**

186. Plaintiff re-alleges and incorporate each preceding and succeeding paragraph of the allegations with the same force and effect as if fully restated herein.

187. Through the conducts described throughout the allegations in this Complaint, Defendants Benz, Sturm and Flynn committed Fraud on Plaintiff by Misrepresenting Material facts about the QST Platform, the Gateway to KCG's and Wedbush's electronic commodity futures trading facility.

188. The aforementioned Defendants had knowledge, of the interconnectivity problems between the QST Platform and ION Trading Platform, and were aware that Plaintiff's electronic trade orders were not being routed and cleared or were not executed in time because of the interconnectivity problems with the QST and ION Platforms for Seventeen (17) full months and took no remedial actions.

189. Said Defendants took no remedial actions for 17 months and had no redundancies to mitigate their operational failures because their intent was to defraud Plaintiff, and they succeeded in doing so.

190. Plaintiff justifiably relied on said Defendants because they were the only ones with the combination of Exchange-Traded Spreads and Exchange-Traded Spread Charts, Harry specializes in, at the time. Furthermore, as Brokers and Agents of Plaintiff and Draper, executing Plaintiff's electronic trade orders, Plaintiff believed and trusted Defendants to look after his interest. Unfortunately, that was not the case. Plaintiff found out belatedly that all the Defendants were Fraudsters, who deceived Plaintiff and Draper about the seamless interconnectivity of their common enterprise, their electronic trading facility, to the defraud Plaintiff and Draper. By engaging in this misconduct, Benz, Sturm and Flynn, violated 7 U.S.C. §§ 6b(a)(l)(A) and (C)., and hence all then other Defendants also violated 7 U.S.C. §§ 6b(a)(l)(A) and (C).

191. As a result of these Fraudulent Misrepresentations by Defendants, Plaintiff has sustained Injury-In-Fact Direct and Consequential Damages, and continues to suffer. Thus, the aforementioned Defendants are liable to Plaintiff for Injury-In-Fact damages in an amount to be proven at trial.

**B2. Defendants' Fraudulent Misrepresentations (Based Under California Law) - Defendants' representations to Plaintiff Harry that their very tightly-integrated Electronic Trading Facility would handle Harry's Electronic Trade Orders with seamless flow was inaccurate and in sharp contrast to the Defendants' consistent**

**Pattern of Failure to Seek to Obtain the Best Execution of Plaintiff's Electronic Commodity Futures Trade Orders for 17 Consecutive Months.**

192. Plaintiff re-alleges and incorporate each preceding and succeeding paragraph of the allegations with the same force and effect as if fully restated herein.

193. Under California Law, Intentional Fraud by Misrepresentation encompasses the following five elements:

> "(a) misrepresentation or false representation;
>
> (b) knowledge of falsity (or 'scienter');
>
> (c) intent to defraud, i.e., to induce reliance;
>
> (d) justifiable reliance; and
>
> (e) resulting damage."

> (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 974; See also *Gonsalves v. Hodgson* (1951) 38 Cal.2d 91, 100-101; *Younan v. Equifax Inc.* (1980) 111 Cal.App.3d 498, 512.)

> The representation must normally state a fact rather than an opinion. Puffing or sales talk is generally considered an opinion (unless dealing with product safety). *(Hauter v. Zogarts (1975) 14 Cal.3d 104, 112).*

> A misrepresentation may be verbal, written or implied by conduct."
> *(Thrifty-Tel, Inc. v. Bezenek* (1996) 46 Cal.App.4th 1559, 1567.)
> "...false representations made recklessly and without regard for their truth in order to induce action by another are the equivalent of misrepresentations knowingly and intentionally uttered." (*Yellow Creek Logging Corp. v. Dare* (1963) 216 Cal.App.2d 50, 55.)

> "Causation requires proof that the defendant's conduct was a 'substantial factor' in bringing about the harm to the plaintiff." (*Williams v. Wraxall* (1995) 33 Cal.App.4th 120, 132.)

194. From August 12, 2013 to November 12, 2013, Benz, the VP of QST and Software Engineers at QST taught and showed Plaintiff how to set up and use the QST-Demo Platform, how to place orders on the Platform that are routed through the virtual CME, CBOT and ICE Exchanges. The QST-Demo Platform was phenomenal in its ease of use to create Exchange-traded Spreads and Spread Charts, and the speed of execution of Plaintiff's electronic trade orders through the Virtual Exchanges was lightning fast. The

1  software Engineers at QST and especially Benz emphatically informed Plaintiff that the
2  QST-Demo is the same as the QST-Live, and that Harry could switch back and forth
3  between the Demo and Live Platforms. Both Benz of QST and Flynn of MST informed
4  Plaintiff in November 2013 before he went live that the QST-Live Platform was tightly
5  connected to the Real Futures Exchanges, just as the QST-Demo was tightly connected to
6  the Virtual Futures Exchanges, and that Harry's Live electronic order flow would be as
7  seamless and fast as the Demo electronic order flow. This came to be a blatant lie and an
8  egregiously malicious misrepresentation, when Harry went live on November 15, 2013. For
9  the next Seventeen (17) months, the interconnectivity problems between the QST Live
10 Platform and the Futures Exchanges became so unbearable that Harry had to finally stop
11 trading with Defendants on April 28, 2015.

12       195. It takes at least 3 months to several years to integrate disparate software
13 packages and even then these packages have to be tested regularly to ensure adequate
14 functionality. This is well-known in the software industry. Thus, all the Defendants
15 especially Benz and Flynn, knew of their interconnectivity problems and intentionally
16 misrepresented to Plaintiff, verbally and on their respective websites, that their
17 dysfunctional Electronic Trading Facility was seamless and tightly integrated.

18       196. The repetitive interconnectivity problems for 17 months only confirm the intent
19 of Defendants to use these problems as a smokescreen to defraud Plaintiff.

20       197. Plaintiff reasonably relied on Defendants' deception and misrepresentation,
21 especially after experiencing the phenomenal performance of the QST-Demo and its
22 lightning fast execution of electronic orders.

23       198. As a result of this intentional and maliciously reckless fraud, Plaintiff has
24 suffered Injury-In-Fact, and continues to suffer financial damages in the form of significant
25 monetary losses, the exact amount of which will be provided at trial.

26       199. Wherefore Plaintiff prays for relief as set forth below.

27              THIRD CAUSE OF ACTION **(BREACH OF FIDUCIARY DUTY UNDER**
28                                     **CALIFORNIA LAW)**

200. Plaintiff re-alleges and incorporates each preceding and succeeding paragraph of the allegations with the same force and effect as if fully restated herein.

201. Defendants KCG, Wedbush, MST, QST and ION, and their Officers, Employees and Agents, including Coleman, E. W. Wedbush, Flynn, Sturm, Benz Pignataro and Sylverne, owe a Fiduciary Duty to Plaintiff by seeking to obtain the best execution of Plaintiff's electronic commodity futures trade Orders, as directed by Plaintiff, in his non-discretionary Trading Account #TSMPF148. *Mosier v. Southern California Physicians Insurance Exchange* (1998) 63 Cal.App.4th 1022, 1044. *Leib v. Merrill Lynch, Pierce Fenner & Smith, Inc.,* 461 F.Supp. 951, 953 (E.D.Mich. 1978); *Gochnauer v. A.G. Edwards & Sons, Inc.,* 810 F.2d 1042, 1049 (11th Cir.1987); *First Union Brokerage v. Milos,* 717 F.Supp. 1519, 1526 (S.D.Fla. 1989); *Platsis v. E.F. Hutton & Co., Inc.,* 642 F.Supp. 1277, 1308 (W.D.Mich. 1986); *Merrill Lynch, Pierce, Fenner & Smith v. Perelle,* 356 Pa.Super. 165, 183-184, 514 A.2d 552, 561 (1983)

202. The aforementioned Defendants woefully breached their fiduciary duty to seek to obtain the best execution of Plaintiff's electronic commodity futures orders for 17 months, and also breached their obligations and fiduciary duties of oversight, good faith and supervision of their employees and their common enterprise, their Electronic Commodity Futures Trading Facility, through which Plaintiff's electronic trade orders were routed and executed. These Defendants made representations about the seamless electronic order flow through their tightly integrated Electronic Trading Platforms.

203. As a result of these Defendants' breaches of their fiduciary duty, Plaintiff has suffered and continues to suffer Injury-In-Fact economic and non-economic losses, all in an amount to determined according to proof at trial.

## FOURTH CAUSE OF ACTION (CLEARING FCM-DEFENDANTS KCG'S AND WEDBUSH'S BREACH OF CONTRACT UNDER CALIFORNIA LAW)

204. Plaintiff re-alleges and incorporates each preceding and succeeding paragraph of the allegations with the same force and effect as if fully restated herein

205. In the Futures Customers Agreement, Exhibits xix-a and xix-b, the following statements are lucidly spelled out,

> "In consideration of the Agreement of KCG Americas LLC to act as broker for the signatory on page 2 hereof (customer) in the purchase or sale of futures (which terms shall include contracts relating to immediate or future delivery of commodities, forward and cash contracts and options on futures) Customer agrees, in respect to all futures accounts which Customer has or may at any future time have with broker, or its successors, including accounts from time to time closed and reopened,"

206 The above excerpt from the Agreement signed by Draper on behalf of Plaintiff Harry and Draper is very explicit, stating that Clearing FCM-Defendant KCG and later Clearing FCM-Defendant Wedbush, would act as Broker for Plaintiff and Draper in the purchase or sale of futures.

207. Plaintiff Harry and Draper met all their aspects of the Agreement with Clearing FCM-Defendants by opening their Trading Account through MST/KCG, depositing their initial $275,000, setting up the QST Platform, the Front End of Clearing FCM-Defendants' Electronic Trading Facility, and then properly clicking the "buy" or "sell" button to trade electronically.

208. As proven without a scintilla of doubt, throughout all the preceding and succeeding paragraphs of the allegations in this Complaint, and backed by irrefutable evidentiary facts in the accompanying Exhibits, Defendants, especially the Clearing FCM-Defendants were ruthlessly willful, unconscionably malicious or wantonly reckless in their purchase and/or sale of Commodity Futures for Plaintiff, whenever he placed his electronic trade orders. In other words, Defendants, especially the Clearing FCM-Defendants failed woefully to seek to obtain the best execution of Plaintiff's Commodity Futures Electronic Trade Orders, whenever Plaintiff Harry clicked the appropriate "buy" or "sell" button; an egregious breach of their contractual Agreement with Plaintiff Harry and Draper.

209. Furthermore, Plaintiff Harry had a contractual agreement with Defendant Computer Voice Systems, Inc ("QST"), for QST to provide their QST Platform, the Front End of FCM-Defendants KCG's and Wedbush's Commodity Futures Electronic Trading Facility, to Harry, for Trading Electronically and for a fee of $299.95 per month..

210. As part of this Agreement, the Technical Department of Defendant-QST taught Plaintiff Harry how to use the QST Platform to place Electronic Trade Orders , and how to set up the Depth of Market ("DOM") to easily click the "left blue button" to "buy' or the "right red button" to "sell" Commodity Future Spreads electronically.

211. Plaintiff Harry met all that was required of him for the QST Trading Platform Agreement with Defendant-QST, by learning to use the Platform properly, setting up the DOM correctly, and then testing the QST Demo Platform for about three months, to ensure that Plaintiff can easily place his Commodity Futures Trade Orders electronically through the real exchanges, and that Defendants' Electronic Commodity Futures Trading Facility was functioning properly. The QST Demo Platform was flawless, as was Defendants' electronic routing and fulfillment of Harry' Electronic Trade Orders through the "Virtual Exchanges".

212. It was only when Plaintiff went from the QST Demo Platform to the QST Live Platform to trade electronically, in the "Real Commodity Futures Exchanges" like CME, CBOT and ICE, instead of the "Virtual Ones" that Plaintiff's trading nightmares with Defendants began, starting from November 15, 2013.

213. As required of him in the Customer Futures Agreement with the FCM-Defendants, and the Platform Agreement with Defendant QST, Harry clicked the "left blue button" to "buy' or the "right red button" to "sell" Futures electronically, and either nothing happened or Plaintiff's electronic Trade Orders were not filled in time by Defendants, in the lightning-fast and dynamic Electronic Commodity Futures Market.

214. Defendants breached their contractual Agreement with Plaintiff Harry and Draper by failing to seek to obtain the best execution of Harry's electronic Trade Orders or failing to fill them in a timely manner, whenever Plaintiff clicked the "left blue button" to "buy' or the "right red button" to "sell" Commodity Futures electronically on the Exchanges..

215. As a direct and proximate result of FCM-Defendants KCG's and Wedbush's, breach of the Customer Futures Agreement and QST's breach of the Platform Agreement,

1  Plaintiff Draper has sustained Financial Losses and Harry has sustained Economic Injury-
2  In-Fact, Physical or Medical Injury-In-Fact, and Procedural Injury-In-Fact, and has been
3  financially damaged in an amount to be proven at trial, which shall include, but not limited
4  to, all compensatory damages, incidental and consequential damages, and other damages
5  allowed by law.

6  FIFTH CAUSE OF ACTION (**DEFENDANTS' AIDING AND ABETTING FRAUD ON**
7  **PLAINTIFF**)

8  216. Plaintiff re-alleges and incorporates each preceding and succeeding paragraph
9  of the allegations with the same force and effect as if fully restated herein.

10  217. Clearing FCM-Defendants KCG and Wedbush, Coleman, E. Wedbush, Gilmore
11  and Hostetler owed duties to Plaintiff Harry and Draper, to truthfully and accurately
12  communicate to Harry and Draper, and to disclose all pertinent information about KCG and
13  Wedbush, especially their businesses, operations, risk profiles, and affiliates, that would be
14  material to Plaintiff Harry's and Draper's decision to entrust their funds to and otherwise do
15  business with KCG and Wedbush and that is otherwise necessary for full and fair disclosure.
16  The aforementioned Defendants breached their obligations to Plaintiff and Draper by
17  deceiving, misrepresenting, lying and materially concealing numerous facts and information
18  about KCG and Wedbush, their businesses and operations, risk profiles and affiliates. By so
19  doing, these Defendants committed fraud, deceit and misrepresentations towards Plaintiff
20  and Draper.

21  218. MST, Flynn, QST, Sturm, Benz, ION, Pignataro and Sylverne aided and
22  abetted, encouraged and rendered substantial assistance to the said Defendants to
23  accomplish the fraud and wrongful acts complained of herein for 17 months. In aiding and
24  abetting and substantially assisting the commission of the acts complained of, MST, Flynn,
25  QST, Sturm, Benz, ION, Pignataro and Sylverne acted with awareness of the Clearing
26  FCM-Defendants, KCG's and Wedbush's, and Coleman's, E. Wedbush's, Gilmore's and
27  Hostetler's Unlawful Acts and realized that their conducts would substantially assist the

28

1  accomplishment of the Unlawful Acts and scheme alleged throughout the allegations of this
2  Complaint:

3      219. As a result of the wrongful conducts of MST, Flynn, QST, Sturm, Benz, ION,
4  Pignataro and Sylverne, Plaintiff has suffered and continues to suffer Injury-In-Fact,
5  economic and non-economic, and financial losses, all in an amount to be determined
6  according to proof at trial.

7      SIXTH CAUSE OF ACTION (**FINANCIAL ELDER ABUSE**)

8      220. Plaintiff re-alleges and incorporates each preceding and succeeding paragraph
9  of the allegations with the same force and effect as if fully restated herein.

10      221. The Defendants violated the Elder Abuse and Dependent Adult Civil
11  Protection Act by taking financial advantage of Draper and by failing to report the abuse,
12  which would have terminated the monumental Fraud.

13      222. At at the time of the Defendants' misconducts, Draper was over 65 years,
14  almost 67 years of age, and thus was an elder as defined by the California Welfare and
15  Institutions Code Section 15610.27

16      223. Each Defendant took, hid, appropriated, obtained and/or retained Draper's
17  Property (Good Faith Deposit of $275,000).

18      224. Alternatively, each Defendant assisted in taking, hiding, appropriating,
19  obtaining, and/or retaining Draper's Property (Good Faith Deposit of $275,000).

20      225. The Defendants took, hid, appropriated, obtained and/or retained, OR, assisted
21  in taking, hiding, appropriating, obtaining, retaining Draper's property for a wrongful use,
22  with the intent to defraud, or by undue influence. Additionally, or alternatively, each
23  defendant's conduct was committed in bad faith.

24      226. Each Defendant knew or should have known that (i) the misconduct was likely
25  to be harmful to Draper; and/or (ii) Draper had the right to have his money or property
26  transferred and made readily available to him.

27      227. Plaintiff Draper was legally and proximately harmed by each defendant's
28  violation of the Act.

SEVENTH CAUSE OF ACTION (<u>**VIOLATIONS OF THE CALIFORNIA UNLAWFUL ACT AND FRAUDULENT CONDUCT LAW (CAL. CORP. CODE §29536 *ET SEQ.*)**</u>)

228. Plaintiff re-alleges and incorporates each preceding and succeeding paragraph of the allegations with the same force and effect as if fully restated herein.

229. California's Unlawful Act and Fraudulent Conduct Law, Cal. Corp. Code § 29536 states as follows:

"It is unlawful for any person, directly or indirectly, in connection with the purchase or sale of, the offer to sell, the offer to purchase, the offer to enter into, or the entry into, a commodity, commodity contract, or commodity option to do any of the following:

(a) To willfully employ any device, scheme, or artifice to defraud.

(b) To willfully make any false report, enter any false record, make any untrue statement of a material fact, or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

(c) To willfully engage in any transaction, act, practice, or course of business which operates or would operate as a fraud or deceit upon any persons.

(d) To willfully misappropriate or convert the funds, security, or property of any other person".

230. California Corporations Code § 29552 provides that any person who "materially assists" in any violation of the California Commodity Law "is jointly or severally liable with any other person" under the law for the violation.

231. Defendants especially the Clearing FCM Defendants purchased and sold Commodity Contracts for Plaintiff Harry as defined under the California Commodity Law, during the relevant period.

232. By their conducts described throughout the allegations in this Complaint, Defendants have violated the California Commodity Law and/or materially assisted in the violations of such law by making material misrepresentations to Plaintiff and concealing material facts from Plaintiff to defraud Plaintiff. Defendants also employed their computer servers, and electronic trading Facility to manipulate the electronic trade orders of Plaintiff for 17 months, to defraud Plaintiff.

233. Plaintiff reasonably relied on Defendants' false statements and representations.

234. Plaintiff has sustained Economic Injury-In-Fact Damages as a direct and proximate result of Defendants' violations of the California Commodity Law, and Plaintiff's Injury-In-Fact financial losses will be determined according to proof at trial.

EIGHTH CAUSE OF ACTION (**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE §17200 *ET SEQ.*)**)

235. Plaintiff re-alleges and incorporates each preceding and succeeding paragraph of the allegations with the same force and effect as if fully restated herein.

236. California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

237. The Defendants' conduct, as described herein, was and is in violation of the UCL. The Defendants' conduct violates the UCL in at least the following ways:

(a) By failing to disclose to Plaintiff that Defendants had interconnection problems with their Electronic Commodity Futures Trading Facility comprising of the QST Front-end Platform, and ION Trading API and Backend Platform that connect to the Exchanges.

(b) By selling subscriptions of their dysfunctional electronic trading Platforms to the Public including Plaintiff, especially their Front-end QST Platform

(c) By knowingly and intentionally concealing from Plaintiff that they had problems routing and matching their customers orders electronically through the Exchanges to buy and sell their Customers electronic orders, including Plaintiff's.

(d) By advertising on the Internet their seamlessly integrated Electronic Trading Platforms making up their Electronic Trading Facility as among the best.

(e) By violating Federal Laws including the CEA.

(f) By violating other California Laws, including California Consumer Protection Laws.

238 The Defendants intentionally and knowingly misrepresented material facts regarding their Common enterprise, the electronic commodity futures trading facility, with an intent to mislead Plaintiff.

239.In subscribing to the Electronic Trading Platforms, and opening Account with the FCM-Defendants, Plaintiff was deceived by Defendants' failure to disclose their interconnectivity problems, their failure to disclose their difficulty to route and fill Plaintiff's electronic trade orders, and their lack of redundant systems for operational failures.

240. Plaintiff reasonably relied upon Defendants' misrepresentations, especially after seeing and testing the flawless QST-Demo Platform. Plaintiff had no way of knowing that Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception, which Plaintiff did not and could not unravel on his own.

241. The Defendants knew or should have known that their conduct violated the UCL.

242. The Defendants owed Plaintiff a duty to disclose the truth about their electronic trade order manipulation because the Defendants:

(a) possessed exclusive knowledge of their electronic trading platforms and electronic trading facility, and manipulated the electronic orders of Plaintiff to his detriment for 17 months

(b) Intentionally concealed the foregoing from Plaintiff, and

(c) consistently and constantly assured Plaintiff that their (Defendants') interconnectivity and electronic order routing problems were already fixed or being fixed.

243. The Defendant's conduct proximately cause injuries to Plaintiff.

244. Accordingly, Plaintiff has suffered Injury-In-Fact, including significant financial losses as a result of Defendants' misrepresentations and omissions.

245. Plaintiff requests that this Court enter such orders or judgments as may be necessary to compensate Plaintiff for Defendants' unfair competition and fraud against Plaintiff, according to California Laws.

NINTH CAUSE OF ACTION (**VIOLATIONS OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT (CAL. CIV. CODE § 1750 *ET SEQ.*)**)

246. Plaintiff re-alleges and incorporates each preceding and succeeding paragraph of the allegations with the same force and effect as if fully restated herein.

247. California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.*, proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

248. The Electronic Commodity Futures Trading Facility and Platforms to which Plaintiff subscribed are "services" as defined in Cal. Civ. Code § 1761(b).

249. Plaintiff is a "consumer" as defined in Cal. Civ. Code § 1761(d), and Plaintiff, and the Defendants are "persons" as defined in Cal. Civ. Code § 1761(c).

250. As alleged above, the Defendants made representations about the seamless integration of their disparate electronic commodity Trading Platforms, and the best of class of their electronic routing and clearing system, that were misleading.

251. In subscribing to the QST Front-end Platform, which is the Gateway to Defendant's Electronic Commodity Futures Trading Facility, Plaintiff was deceived by Defendants' failure to disclose the dysfunctionality of their Electronic Trading system and its interconnectivity problems.

252. The Defendant's' conduct, as described herein, was and is in violation of the CLRA. The Defendants' conduct violates at least the following enumerated CLRA provisions:

(a) Cal. Civ. Code § 1770(a) (4): Using deceptive representations in connection with services

(b) Cal. Civ. Code § 1770(a) (5): Representing that services have, characteristics, benefits, which they do not have.

(c) Cal. Civ. Code § 1770(a)(7): Representing that services are of a particular standard, quality, or grade, if they are of another.

(d) Cal. Civ. Code § 1770(a)(9): Advertising services with intent not to sell them as advertised

(e) Cal. Civ. Code § 1770(a) (13): Making false or misleading statements of fact concerning reasons for, existence of,

(f) Cal. Civ. Code § 1770(a)(16): Representing that services have been supplied in accordance with a previous representation when they have not.

253. The Defendants intentionally and knowingly misrepresented material facts regarding their Electronic Trading Platforms and Electronic Trading Facility with an intent to mislead Plaintiff.

254. In subscribing to the Electronic Trading Platform, and hence Electronic Trading Facility, Plaintiff was deceived by Defendants' failure to disclose the interconnection problems and order routing and matching problems.

255. Plaintiff reasonably relied upon Defendants' false representations. Harry had no way of knowing that Defendants representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiff did not and could not have unravel the Defendants' deception on his own, especially after seeing and using the flawless QST-Demo Platform for three months..

256. The Defendants knew or should have known that their conduct violated CLRA.

257. The Defendants owed Plaintiff a duty to disclose the truth about their electronic order manipulations because the Defendants:

(a) possessed exclusive knowledge of their manipulated electronic trading system that failed to route and match Plaintiffs electronic trade orders.

(b) intentionally concealed the foregoing from Plaintiff and/or

(c) Made incomplete representations that they manipulated the electronic trading system by their failure to route Plaintiff's trade orders, while purposefully withholding material facts from Plaintiff that contradicted these representations.

258. The Defendants' conduct proximately caused injuries to Plaintiff.

259. Plaintiff was injured and suffered ascertainable loss, Injury-In-Fact, and actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequences of the Defendants' misrepresentations and omissions.

260. The Defendants knew, should have known, or were reckless in not knowing of their interconnectivity problems and order routing and matching failures.

261. The facts concealed and omitted by the Defendants are material in that a reasonable consumer would have considered them in deciding whether to open a Trading Account with FCM-Defendants or not. Had Plaintiff known of these interconnection problems or order routing and matching issues, Plaintiff and Draper would never have opened a Trading Account with Clearing FCM-Defendants

262. Plaintiff and his Trading Business Partner, Ronald Draper sent Defendants a notice of their violations in 2015 without mentioning CLRA. Thus, Plaintiff Harry is again sending Defendants specific notice of their violations of the CLRA, pursuant to Cal. Civ. Code § 1782(a).

263. Plaintiff's injuries were proximately caused by the Defendants' unlawful and deceptive business practices.

264. Plaintiff's Injury-In-Fact Damages to recover from Defendants under the CLRA are included in the $45 million Plaintiff is seeking from Defendants, and the exact amount for damages under CLRA will be shown and proven during trial.

### TENTH CAUSE OF ACTION (**VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW (CAL. BUS. & PROF. CODE § 17500 *ET SEQ.*)**)

265. Plaintiff re-alleges and incorporates each preceding and succeeding paragraph of the allegations with the same force and effect as if fully restated herein.

266. California Bus. & Prof. Code § 17500 states: "It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that real or personal property or those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading".

267. The Defendants' caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which is known, or which by the exercise of reasonable care should have been known to the Defendants, to be untrue or misleading to consumers including Plaintiff.

268. The Defendants have violated § 17500 because the misrepresentations and omissions regarding the functionality and reliability of their Electronic Trading Platforms and Electronic Trading Facility as set forth in this Complaint were material and likely to deceive a reasonable Consumer, including Plaintiff.

269. Plaintiff has suffered an Injury-In-Fact, including the loss of money as a result of Defendants' unfair, unlawful and/or deceptive practices. In opening an Account with the FCM-Defendants and subscribing to their Front-end QST Platform and Electronic Trading Facility, Plaintiff relied on the misrepresentations and/or omissions of the Defendants with respect to the functionality and reliability of their Electronic Trading Platforms and Facility. The Defendants' representations turned out to be totally false because the electronic trading

Platforms and Trading Facility were defective and dysfunctional, and were unable to route and match Plaintiff's electronic Trade Orders. Had Plaintiff and Draper known of this, they would not have opened a Trading Account with the FCM-Defendants or subscribed to Defendants Front-end QST Platform, the gateway to their Electronic Trading Facility.

270. All of the wrongful conduct alleged herein occurred in the conduct of the Defendants' businesses during the relevant period. Defendants' wrongful conducts are part of a pattern of conduct that was repeated both in California and Nationwide, during the relevant period.

271. Plaintiff requests that this Court enter such order or judgments as may be necessary to restore to Plaintiff any money the Defendants acquired by their unfair competition.

### ELEVENTH CAUSE OF ACTION (DEFENDANTS' EMPLOYMENT OF MANIPULATIVE COMPUTER SOFTWARE PROGRAMS, COMPUTER SERVERS, ELECTRONIC TRADING FACILITY AND MANIPULATIVE SCHEME TO DEFRAUD PLAINTIFF

272. Plaintiff re-alleges and incorporates each preceding and succeeding paragraph of the allegations with the same force and effect as if fully restated herein.

273. During the relevant period, Flynn of MST, Coleman of KCG, E. Wedbush of Wedbush, and Gilmore and Hostetler of both KCG and Wedbush fraudulently concealed material facts about the Clearing FCM-Defendants, KCG and Wedbush, which if known to Plaintiff and Draper, would have ensured that Plaintiff and Draper never opened a Futures Trading Account with KCG or allow the Account to later be transferred from KCG to Wedbush.

274. Furthermore, during the same relevant period, Flynn of MST, Sturm and Benz of QST, and Pignataro and Sylverne of ION directly or indirectly participated in the fraudulent misrepresentations specified herein, which they knew were misleading or recklessly disregarded as misleading.

275 All the aforementioned Defendants violated Section 6(c)(1) of the CEA in that they (a) employed devices, scheme, and artifices to defraud; (b) made untrue statements of

material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in practices, and of course of businesses that operated as a fraud or deceit upon Plaintiff in connection with the purchase and sale of commodity futures for Plaintiff during the relevant period. As detailed herein, the Defendants' misrepresentations to Plaintiff and their fraudulent concealment of material facts from Plaintiff included the Companies' operational practices, risk profiles, financial malfeasances, and internal controls.

276. These Defendants, individually and collectively, directly or indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiff; made various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements with reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of commodity futures, which were intended to, and did: (1) deceive Plaintiff, regarding among other things, the improper operational practices and deficient internal controls of KCG, QST, Wedbush, and ION.

277. Defendants MST, KCG, QST, ION and Wedbush are liable for all the materially false and misleading statements made during the relevant period, as alleged above.

278. Defendants Flynn, Coleman, Gilmore, Hostetler, Sturm, Benz, Pignataro, Sylverne and E. Wedbush, as top executive Officers of their respective Companies, are liable as direct participants in the wrongs complained herein. Through their positions of authority as officers of their respective companies, each of these Defendants was liable to and did have authority over the misrepresentations and fraudulent concealments of the their respective companies. These Defendants had direct involvement in the daily business of their respective companies and participated in the preparation and dissemination of the false and misleading statements on their respective Company Websites.

279. As described above, these Defendants acted with scienter throughout the relevant period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them for 17 months.

280. Plaintiff has suffered Injury-In-Fact economic and non-economic losses.

281. As a direct and proximate result of these Defendants' wrongful acts, Plaintiff suffered damages in connection with the purchase and sale of commodity Futures during the relevant period, including financial losses, the exact amount of which will be provided during trial.

# XI. CONCLUSION

282. It has been three years and six months of hell for Plaintiff and Harry, whose only "crime" was to move their Futures Account #TSMPF148 from their previous Broker, OEC/Daniels Trading to KCG and Wedbush because of the difficult OEC Trading Platform. defendants' Maliciousness and cold-blooded Ruthlessness just to make money by defrauding Plaintiff is simply too mind-numbing to even imagine.

# XII. DEMAND FOR RELIEF

Wherefore, Plaintiff prays for relief as set forth below:

**FOR ALL CAUSES OF ACTION (FIRST THROUGH ELEVENTH)**

A. Plaintiff is entitled to and hereby demand his Initial Trading Fund or Good Faith Deposit of the $275,000 from Defendants.

B. Plaintiff is entitled to and hereby demand compensation for Defendants' Financial Abuse of Elderly Draper, and the exact amount will be obtained during trial

C. Plaintiff is entitled to and hereby demand compensation for Emotional Distress and suffering, and the exact amount will be obtained during trial.

D. Plaintiff is entitled to and hereby demand pre-judgment and post-judgment interest on such monetary relief as stipulated in 28 U.S.C. 1961.

# XIII. DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues.

# XIV. EXHIBITS

The Exhibits are available only electronically.

Respectfully submitted

| | | |
|---|---|---|
| **Ronald S. Draper** | | **04/27/2018** |
| Plaintiff's Name | Plaintiff's Signature | Date |